UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
LIFENG CHEN, et al.,                    :

            Plaintiffs,        :        **REPORT & RECOMMENDATION**

        -against-              :        **11 Civ. 0324 (GBD)(MHD)**

NEW TREND APPAREL, INC., et al.,   :

            Defendants.        :
-----------------------------------x
HANA FINANCIAL, INC.,                   :

        Intervenor Plaintiff,  :                    3/7/14

        -against-              :

NEW TREND APPAREL, INC., et al.,   :

        Intervenor/            :
        Third-Party Defendants.
-----------------------------------x

**TO THE HONORABLE GEORGE B. DANIELS, U.S.D.J.:**


    Once again this court visits a lawsuit that involves
competing claims among the creditors and agents of defendant New
Trend Apparel, Inc., a wholesale garment supplier. Currently
before the court are motions by plaintiffs and the intervenor
plaintiff for summary judgment.


    For the reasons discussed below, we recommend that the
motion of intervenor plaintiff Hana Financial be granted in part

1

and denied in part. We recommend that the Chen plaintiffs'
motion for summary judgment be denied.

**FACTUAL BACKGROUND**

The underlying facts in this case are as follows. Where
pertinent, we note disputes as to material facts.

**The New Trend Defendants**

Kisum Louie and his wife, Byunglim Louie, operated New
Trend Apparel, Inc. ("New Trend"), a now-defunct New York
corporation that sold wholesale women's apparel imported from
China. (Hana 56.1 Statement in Supp. of Summ. J. [docket no.
276], ¶ 1; Chang 56.1 Opp'n to Hana and Chen Mots. ("Chang 56.1
Opp'n") [docket no. 296], Resp. 1; Lee Decl. dated Apr. 15, 2013
[docket no. 275], Ex. I ¶ 3). Kisum Louie served as president of
the company (Hana 56.1 Statement in Supp. of Summ. J., ¶ 7;
Chang 56.1 Opp'n, p. 5 Resp. 7) and Byunglim Louie helped to
oversee the bookkeeping and the warehouse. (Lee Decl. dated Apr.
15, 2013, Ex. I; Byunglim Louie Decl. dated Apr. 22, 2013
[docket no. 288], 1). At various times, Byunglim Louie used the
titles of secretary, co-owner, and vice-president of New Trend

2

(see Chang Decl. dated May 23, 2013 [docket no. 294], Ex. D; Sheppeard Decl. dated Apr. 16, 2013 [docket no. 277], Ex. 1 at "Signature Card"; Lee Decl. dated Apr. 15, 2013, Ex. I ¶ 2), but she testified at her deposition that she held no formal title, due to the small size of the company. (Chang Decl. dated May 23, 2013 Ex. A ("Byunglim Louie Dep."), p. 138). Byunglim Louie also served as the principal of JCM Logistics Inc., New Trend's warehousing company. (Lee Decl. dated Apr. 15, 2013, ¶ 2).

**New Trend's Dealings with the Chen Parties**

On or about January 11, 2009, New Trend entered into a Letter of Intent with Sunning Eagle Holdings Ltd. ("Sunning Eagle"), one of plaintiff Lifeng Chen's companies. (Chen 56.1 Statement in Supp. of Summ. J. ("Chen 56.1 Statement") [docket no. 284], ¶ 1; New Trend 56.1 Opp'n to Chen Mot. [docket no. 287], Resp. no. 1; Chang 56.1 Opp'n, p. 18 Resp. no. 1; Chen Aff. dated Jan. 17, 2011 [docket no. 282], Ex. A). Pursuant to the Letter of Intent, Sunning Eagle pledged to purchase fifty percent of the shares in New Trend and to share half of New Trend's expenses and profits. (Chen Aff. dated Jan. 17, 2011, Ex. A ¶ 1). The agreement further provided that Chen's company would supply goods from China, mainly "seamless underwears,

3

socks, shirts, normal underwears and trousers, which are specialized by ZHEJIANG MEIBANG TEXTILE CO., LTD," another of Chen's companies, but the contract allowed that "[b]oth of the two parties have the right to import the goods whose price is lower than [Sunning Eagle's] price." (Id. at ¶ 2). The parties also agreed that the scope of the business would not be limited to goods supplied by Chen's company, stating "[a]ll businesses with profits are allowed, but have to be decided by both parties. In the case of the business decided by one part[y], this party should share the los[s] or profit itself and bear all the relevant expenses." (Id. at ¶ 3). The agreement also proscribed New Trend from unilaterally offering loans or guarantees to others (see id. at ¶ 5), and, somewhat ambiguously, stated that "[i]t is [New Trend] as the artificial person of the company. The two parties operate the business together." (Id. at ¶ 6).


New Trend sold garments under two brand names, "Paris Angel" and "Miss Juli." Around the time of the negotiations between New Trend and Sunning Eagle, New Trend purportedly intended to seek trademark registration of those marks. (See, e.g., Chen 56.1 Statement in Supp. of Summ. J., ¶ 10; New Trend 56.1 Opp'n to Chen Mot., Resp. nos. 10-12; Byunglim Louie Decl.

4

dated Apr. 22, 2013, ¶¶ 13-14). Without specific reference to those brand names, the Letter of Intent stated, "[o]n success of trademark registration, its ownership and usufruct are kept by both parties: No party can use or own it unilaterally." (Chen Aff. dated Jan. 17, 2011, Ex. A ¶ 4).

New Trend issued one hundred shares of company stock to Mr. Chen, in his individual capacity, on February 24, 2009 pursuant to a stock-transfer agreement. (Id. at p. 2; Byunglim Louie Decl. dated Apr. 22, 2013, Ex. A). In return, on February 26, 2009, Sunning Eagle transferred $1 million to New Trend, apparently representing its initial investment in the company. (See Chen Aff. dated Jan. 17, 2011, Ex. B p. 1). The stock-transfer agreement stated: "[t]his agreement embodies the entire understanding between the parties and may only be modified by writing signed by both parties." (Byunglim Louie Decl. dated Apr. 22, 2013, Ex. A ¶ 8).

On or about May 18, 2009, Sunning Eagle and New Trend entered into a Supplementary Agreement to the Letter of Intent. (See Chen Aff. dated Jan. 17, 2011, Ex. C). In essence, that supplementary agreement provided the terms for the payment and delivery of goods to New Trend from Chen's manufacturing

companies in China. (See id.). Among other items, the agreement provided that if the Chen parties failed to deliver goods on schedule, they must "compensate [New Trend] 10% of the total amount as a penalty." (Id. at ¶ 4).

Chen asserts that additional oral agreements were made between the parties during their negotiations. He asserts, for example, that "[Kisum] Louie would hold the office of the President but he would merely function as a sales person to conduct sales for NTA due to his connections with the garment industry." (Chen Aff. dated Jan. 17, 2011, ¶ 10). Chen also asserts that

> Prior to entering into the Letter of Intent, pursuant to an oral agreement, each party was to invest one million dollars capital in NTA in exchange of 50% of the shares. Louie represented that he was not able to provide cash but had inventory valued at about $300,000 at that time and also his warehouse and office for which he already paid rent for three years. It was agreed that Louie would invest in NTA the sales proceeds for his $300,000 inventory, the office and warehouse, and his share of NTA's future profits. It was further agreed that before Louie invested one million dollars in total, he would not be entitled to any shareholder rights.

(Id. at ¶ 11). The New Trend parties dispute that they entered into any such oral agreements with the Chen

6

parties. (See New Trend Mem. of Law in Opp'n to Chen Mot., 6-7; New Trend 56.1 Opp'n to Chen Mot., 8).

There is no meaningful dispute that on March 3, 2009, New Trend wired $1 million to the Chen parties. (Cai Decl. dated Apr. 12, 2013, ¶¶ 15-16; Chen 56.1 Statement in Supp. of Summ. J., ¶ 5; New Trend 56.1 Opp'n to Chen Mot., Resp. no. 5; but see Hana 56.1 Opp'n to Chen Mot., Resp. no. 5 (asserting that "Mr. Chen does not speak or read English and his Affidavit must thus be disregarded," an argument which we reject for reasons set forth below (see infra 101-04)). This payment apparently served as "advanced payments for the orders placed" by New Trend with Chen's manufacturing companies. (Chen 56.1 Statement in Supp. of Summ. J., ¶ 5; New Trend 56.1 Opp'n to Chen Mot., Resp. no. 5). It is also undisputed that Chen's factories shipped goods worth $2,072,184.76 to New Trend over the course of 2009 and 2010. (See Chen 56.1 Statement in Supp. of Summ. J., ¶ 6; New Trend, Hana, and Chang 56.1 Opp'n Statements to Chen Mot. at Resp. no. 6). All of the parties agree that, exclusive of New Trend's March 3, 2009 advance payment of $1 million, New Trend paid the Chen parties $1,256.382.12 for goods during the period between April 2009 and February 2010. (See Chen 56.1 Statement in Supp.

of Summ. J., ¶ 8; New Trend, Hana, and Chang 56.1 Opp'n Statements to Chen Mot. at Resp. no. 8).

The Chen parties argue that they are still owed $815,802.64 from New Trend (Chen 56.1 Statement in Supp. of Summ. J., ¶ 9), but Hana and the New Trend parties argue that this amount fails to capture the $1 million advance payment of March 3, 2009. (New Trend and Hana 56.1 Opp'n Statements to Chen Mot., Resp. no. 9). They further argue that the Chen parties' calculations fail to capture other amounts owed by the Chen parties to New Trend, pursuant to the Letter of Intent and Supplementary Agreement, including penalty fees for late shipments and shared expenses. (Id.; Byunglim Louie Decl. dated Apr. 22, 2013, 2-4).

## New Trend's Dealings with Hana and the Chang Parties

Byunglim Louie met Nina Chang in 2009 (Lee Decl. dated Apr. 15, 2013, Ex. I ¶ 4; Chang Decl. dated May 23, 2013, ¶ 7), and in early 2010 New Trend hired Ms. Chang. (See id. at ¶ 5; Hana 56.1 Statement in Supp. of Summ. J., ¶ 9; Chang 56.1 Opp'n, p. 6 Resp. no. 9). Chang's title and the scope of her duties at New Trend are disputed among the parties. (See, e.g., Lee Decl. dated Apr. 15, 2013, ¶ 17). The New Trend parties describe Chang

8

as the company's Chief Financial Officer. (See, e.g., Wang Decl.
dated Apr. 16, 2013 [docket no. 279], Ex. F ¶ 6). At a minimum,
Chang admits that she "performed various administrative and
human resource duties, lia[i]sed with New Trend's factor,
attempted to find New Trend a new factor, and looked over
records." (Chang Decl. dated May 23, 2013 ¶ 8).

    In the summer of 2010, Ms. Chang approached Hana Financial,
Inc. to obtain business financing for New Trend. (Lee Decl.
dated Apr. 15, 2013, ¶ 2; Lee Dep. 10). At that time, New Trend
was factored by Sterling Factors Corp. ("Sterling"), and New
Trend sought to replace Sterling with Hana as its factor. (Lee
Decl. ¶ 2).

    On July 27, 2010, Hana and New Trend entered into a
factoring and loan agreement. (Id. at Ex. A pp. 1-15). Among
other things, the factoring agreement gave Hana a security
interest in New Trend's "(i) Accounts; (ii) general intangibles
including payment intangibles;… (v) all inventory, machinery,
equipment, furniture and fixtures and[] (vi) proceeds of any of
the foregoing property." (Id. at Ex. A § 8). The agreement
defined New Trend's obligations to Hana to include "[a]ll loans,
advances, debts, liabilities, obligations, covenants and duties

9

owing by [New Trend] to Hana, direct or indirect, absolute or contingent, due or to become due... including, without limitations, Ledger Debt and indebtedness arising under any guaranty made by [New Trend] for Hana's benefit." (Id. at Ex. A § 13). Kisum Louie and Byunglim Louie each executed personal guarantees on New Trend's debts to Hana. (Id. at Ex. A). Hana then perfected its security interest in the New Trend collateral by filing a UCC-1 financing statement. (Id. at Ex. B).

On August 5, 2010, Hana also agreed to provide a short-term loan of $500,000.00 to JCM Logistics. (Id. at Exs. C, D). The loan was secured by a second-position perfected interest, behind Sterling, in New Trend's assets and a first perfected security interest in the assets of JCM Logistics, including receivables from New Trend. (Id. at ¶ 4 & Exs. C, D).

In late 2010, Byunglim Louie apparently became sick with cancer and, as a result, the New Trend parties advised Hana that their business operations would be negatively impacted. (Id. at ¶ 11). In February 2011, Hana advised JCM Logistics that it had defaulted on its Promissory Note, demanding full repayment by February 20, 2011. (Id. at ¶ 12, Ex. E). It advised that, after that date, Hana would "exercise all of our rights and remedies

10

under the Note, any guaranty thereof, any collateral securing that guaranty and any and all rights and remedies granted to us by applicable law, without further notice to you or any guarantor." (Id. at Ex. E).

In or about October 2010, Nina Chang started New York Clothing Group ("NYCG"), a wholesale company specializing in women's apparel. (Id. at Ex. J; Hana 56.1 Statement in Supp. of Summ. J., ¶ 4; Chang 56.1 Opp'n, p. 4 Resp. no. 4; Chang Decl. dated May 23, 2013, ¶ 13). The role of Chang and NYCG in disposing of certain New Trend inventory has been a matter of ongoing controversy in this case. Byunglim Louie has testified that Chang proposed using her new company to spirit away from New Trend some of the inventory that was subject to Hana's lien and a court freeze order. According to Mrs. Louie, consistent with that proposal, New Trend made a series of conveyances to NYCG without consideration, at a time when New Trend had insufficient capital to meet its matured debts. (Lee Decl. dated Apr. 15, 2013, Ex. I ¶¶ 1, 12, 16). She further asserted that the conveyances left New Trend insolvent. (Id.). More specifically, in a December 21, 2011 affidavit, Byunglim Louie reported that, "[i]n October 2010, Nina Chang proposed to move New Trend Apparel inventory to another location. She indicated

11

that Hana Financial would place a lien on inventory if the Hana Financial loan to New Trend was not paid." (Id. at ¶ 10). According to Mrs. Louie, Chang

> said that if New Trend Apparel inventory was transferred to [New York Clothing Group], [Chang] could use that inventory to secure a very large loan, and with that money, the creditors of New Trend Apparel could be satisfied. Nina Chang stated that her intent was to assign New York Clothing Group to New Trend Apparel after two years.

(Id. at ¶ 11). Mrs. Louie stated that she and Chang "agreed to create invoices that purported to show a sale of New Trend Apparel stock [i.e., inventory] to New York Clothing Group Inc," asserting that the "quantity of merchandise shown on the invoices is correct but the Unit Price was fabricated and far below actual value." (Id. at ¶ 12). Mrs. Louie also indicated that a document that she signed for Ms. Chang on August 17, 2011 "contained false and inaccurate information" concerning inventory purportedly sold by New Trend to NYCG. (Id. at ¶ 17).

In contrast, Ms. Chang asserts that Mrs. Louie has entirely fabricated the story of fraud. (Chang Decl. dated May 23, 2013, ¶¶ 20-24). She insists that she paid for the inventory that she purchased from New Trend and that the invoices are accurate (Chang Decl. dated May 23, 2013, ¶¶ 24, 92, 96-97, 99), although

12

she admits that she paid in cash only a small portion of the documented price for the goods. (Chang Decl. dated May 23, 2013 Ex. C ("Chang Dep.") pp. 137-40). Chang asserts that Mrs. Louie insisted on being paid in cash, rather than by check. (Chang Decl. dated May 23, 2013, ¶¶ 18, 100).

Mrs. Louie has produced tapes of conversations that she secretly recorded between herself and Ms. Chang, purportedly concerning these transactions and their aftermath. (See Chang Supplemental Decl. dated Mar. 7, 2012 [docket no. 160] Exs. 1-6; Sheppeard Decl. dated Apr. 16, 2013 Exs. 14, 17, 19, 21, 29). Ms. Chang complains that the recordings may be incomplete and "might have been stopped and restarted" (Chang Decl. dated May 23, 2013, ¶ 41), thus failing to accurately capture the entirety of the women's conversations, but she does not contest that the available portions of their conversations actually took place or that her voice is one of the two heard on the tapes. (See, e.g., id.). Hana and the Chang parties have produced competing translations of the original Korean-language recordings. (See, e.g., Sheppeard Decl. dated Apr. 16, 2013, Exs. 14, 17, 19, 21, 29; Chang Supplemental Decl. dated Mar. 7, 2012 Exs. 1-6).

13

## PROCEDURAL HISTORY

As the court will recall,[1] this lawsuit was initiated by plaintiff Lifeng Chen and a number of corporate entities that he owned or controlled (collectively, "the Chen plaintiffs"). These plaintiffs originally sued New Trend and its principal, Kisum Louie, on January 18, 2011. (Compl. [docket no. 1]). In substance, the Chen plaintiffs complained that they had paid $1 million for a fifty-percent share of an anticipated joint business venture with defendants New Trend and Mr. Louie, that the venture had never gone forward, and that defendants had nonetheless failed to return their money. (See Compl. ¶¶ 14-22, 43-45, 49-51). The Chen plaintiffs also asserted that they had delivered goods from China to New Trend for which the defendants had never paid. (Id. ¶¶ 38-40).

At the outset, plaintiffs sought and obtained from the District Court an ex parte preliminary injunction that, in effect, froze the assets of New Trend (see Order to Show Cause ("OSC") dated Jan. 18, 2011 [docket no. 4]) -- injunctive relief

---

[1] The following discussion of the case's procedural history is borrowed in large part from our April 20, 2012 Report and Recommendation. (See Report & Recommendation dated Apr. 20, 2012 [docket no. 220], 2-9). We reiterate that discussion here for the sake of convenience.

that the District Court adhered to despite the subsequent
insistence of the New Trend defendants that Mr. Chen had taken
his money back, causing the joint-venture deal to collapse, and
that he had sent the New Trend defendants defective goods and
had stolen business opportunities from those same defendants.
(See Sheppeard Decl. dated Feb. 10, 2012 [docket no. 142] Ex. 3
(Kisum Louie Aff.), ¶¶ 5-11, 15-22; New Trend Mem. of Law in
Opp'n to Pls.' OSC Appl., dated Feb. 8, 2011 [docket no. 9], 3-
4; Order dated Feb. 17, 2011 [docket no. 14] (granting
preliminary injunction)). The complaint was amended several
times, expanding the list of defendants, all of whom are said
have been related in one way or another to the original New
Trend defendants, with the current operative pleading being the
Third Amended Complaint. (See Wang Decl. dated Jan. 11, 2012
[docket no. 123] Ex. 5 (3d Am. Compl.); Aff. of Service dated
Mar. 8, 2012). The additional defendants include Kisum Louie's
wife, Byunglim Louie, and a variety of corporate entities that
Mr. and Mrs. Louie allegedly set up in conjunction with their
New Trend business, including JCM Logistics.

In May 2011, Hana Financial intervened as a plaintiff to
enforce its claims to New Trend's assets, premised on New
Trend's guarantee of the defaulted August 2010 loan to JCM

15

Logistics. (See Sheppeard Decl. dated Dec. 28, 2011 Ex. 3 (Lee Decl. dated May 10, 2011), ¶¶ 4-6, 9-19). The intervention by Hana eventually led to an agreement among the parties to permit Hana and the Chen plaintiffs to attempt to sell some New Trend inventory that had been located at the outset of the lawsuit, but that was apparently of rapidly diminishing value. (Sheppeard Decl. dated Dec. 28, 2011 ¶ 11 & Ex. 6). The proceeds of that sale are now held in escrow by Hana's counsel. (Apr. 11, 2012 Conf. Tr. 26).

In late December 2011, while discovery was still ongoing, Hana moved to amend its intervenor complaint to add two new defendants, NYCG and Nina Chang (collectively, "the Chang parties" or "the Chang defendants"). Hana alleged that in October 2010 Ms. Chang, while still with New Trend, had arranged with Mrs. Louie to defeat Hana's security interest in New Trend's assets by forming NYCG and transferring to it, from New Trend, a substantial amount of inventory, some wholesale orders, and cash. (See Hana's Mem. of Law in Supp. of OSC, dated Dec. 28, 2011, 1-2). At the same time that it sought leave to amend, Hana moved by order to show cause for a temporary restraining order and preliminary injunction to freeze the assets of the Chang parties (see Hana's OSC Appl.; Hana's Mem. of Law in Supp.

16

of OSC, dated Dec. 28, 2011, 1), an application undergirded by the affidavit from Mrs. Louie admitting her role in the purportedly fraudulent transfer. (See Byunglim Louie Aff. dated Dec. 21, 2011, ¶ 1; see also Byunglim Louie Aff. dated Feb. 15, 2012 ¶ 15).

We signed the order to show cause, with its temporary-restraining-order ("TRO") provision, and set a schedule for additional briefing. (See OSC & TRO dated Dec. 28, 2011). The Chen plaintiffs, in response to the TRO, filed a motion for a preliminary injunction to freeze the assets of Byunglim Louie and JCM Logistics. (See Pls.' PI Cross-Mot. dated Jan. 11, 2012; 1st Wang Decl. dated Jan. 11, 2012, ¶¶ 4-9; 2nd Wang Decl. dated Jan. 11, 2012, ¶¶ 16-23). In the same application, the Chen plaintiffs asked for leave to amend their complaint once more, to add claims against NYCG and Ms. Chang. (See 1st Wang Decl. dated Jan. 11, 2012, ¶¶ 10-19). We granted the motions of Hana and the Chen plaintiffs to amend their respective complaints to add NYCG and Ms. Chang as defendants. (See Mem. & Order and Report & Recommendation dated Feb. 23, 2012 [docket no. 154], 6, 8).

17

On January 18, 2012, while the December 28, 2011 order to show cause was pending and awaiting full briefing, counsel for Hana submitted to the court a stipulation -- signed on behalf of Hana and the Chang defendants -- that required NYCG and Ms. Chang to deposit a specified sum of money in escrow and subjected the financing and business operations of NYCG to continuing scrutiny, in exchange for which NYCG would be permitted to continue in business while the lawsuit was pending. (See Stip. dated Jan. 18, 2012,[2] ¶¶ 3, 5-6, 9). The stipulation further specified that the TRO would remain in effect until NYCG and Ms. Chang had satisfied their obligations under the agreement. (Id. at ¶ 10). The Chen plaintiffs, rather than directly opposing the stipulation, moved by order to show cause for a preliminary injunction against Ms. Chang and NYCG that would freeze their assets. (See Pls.' OSC Appl. dated Jan. 27, 2012).

With these applications pending, Ms. Chang and NYCG sought through new counsel to repudiate the agreement embodied in their stipulation with Hana. (See Kornfeld Decl. dated Apr. 2, 2012 [docket no. 182], Ex. C). The court subsequently deemed the

---

[2] The stipulation can be found as the last of several exhibits labeled "Exhibit 2" attached to the January 26, 2012 declaration of Heng Wang, Esq.

Chang defendants bound by the terms of the January 18, 2012 stipulation and denied the Chen plaintiffs' application for a preliminary injunction. (See Mem. & Order dated Nov. 19, 2012 [docket no. 253], 4-9; see also Report & Recommendation dated Apr. 20, 2012).

Discovery has been completed, and the court is called upon to consider the summary-judgment motions of Hana and the Chen plaintiffs. Hana seeks a declaratory judgment holding that it has a superior interest in the New Trend collateral over the other parties and granting it an immediate right to possession of the assets held in escrow from the sale of the collateral. (Hana Summ. J. Mem. at 3-4). It also seeks summary judgment on its claims for breach of contract against New Trend, the Louies, and JCM (id. at 10-12), and at 13), and on its claims of conversion and fraudulent conveyance against Nina Chang and NYCG. (Id. at 14-15).

The Chen plaintiffs seek summary judgment on their breach-of-contract claims against the New Trend defendants, on their unjust-enrichment claims against the New Trend defendants and the Chang defendants, on their fraudulent-conveyance claims against the New Trend defendants and the Chang defendants, and

19

on their conversion claim against the Chang defendants. (Chen Summ. J. Mem. of Law, 3-7). They also seek an award of attorney's fees. (Id. at 7-8).

## ANALYSIS

### I. **Summary Judgment Standards**

Summary judgment will be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law [while] [a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Shade v. Hous. Auth. of the City of New Haven, 251 F.3d 307, 314 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). It is axiomatic that the responsibility of the court in deciding a summary-judgment motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11

20

(2d Cir. 1986); see, e.g., Anderson, 477 U.S. at 255; Howley v. Town of Stratford, 217 F.3d 141, 150-51 (2d Cir. 2000).

The movant bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that demonstrate the absence of a genuine issue of material fact. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If the non-moving party has the burden of proof on a specific issue, the movant may satisfy its initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim. See, e.g., Celotex, 477 U.S. at 322-23, 325; PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002); Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).

The court must view all evidence in the light most favorable to the non-moving party, Overton v. N.Y. State Div. of Military & Naval Affairs, 373 F.3d 83, 89 (2d Cir. 2004), and must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Sec. Ins. Co. of Hartford v. Old Dominion Freight

21

Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004). "[A]ll doubts as to the existence of a genuine issue for trial should be resolved against the moving party," Brady v. Town of Colchester, 863 F.2d 205, 210 (2d Cir. 1988) (citing Celotex, 477 U.S. at 330 n. 2), but "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[;] [f]actual disputes that are irrelevant or unnecessary will not be counted." Anderson, 447 U.S. at 248.

If the movant fails to meet its initial burden, the motion will fail even if the opponent does not submit any evidentiary materials to establish a genuine factual issue for trial. See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 160 (1970); Giannullo, 322 F.3d at 140-41. If, on the other hand, the moving party carries its initial burden, the opposing party must then shoulder the burden of demonstrating a genuine issue of material fact on any such challenged element of its claim or defense. See, e.g., Beard v. Banks, 548 U.S. 521, 529 (2006); Celotex, 477 U.S. at 323-24; Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001). In doing so, the opposing party may not rest "merely on allegations or denials" of the factual assertions of the movant, Fed. R. Civ. Pro. 56(e); see, also, e.g., Goldstein v.

22

Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti, 374 F.3d 56, 59-60 (2d Cir. 2004), nor may it rely on its pleadings or on merely conclusory factual allegations. See, e.g., Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). It must also "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Woodman v. WWOR-TV, Inc., 411 F.3d 69, 75 (2d Cir. 2005). Rather, it must present specific evidence in support of its contention that there is a genuine dispute as to the material facts. See, e.g., Celotex, 477 U.S. at 324; Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998); Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 526 (2d Cir. 1994).

If both sides move for summary judgment, the court must separately assess the adequacy of each motion. Thus, if neither movant satisfies its Rule 56 burden, the court must deny both motions. E.g., Marvel Entm't, Inc. v. Kellytoy (USA), Inc., 769 F. Supp.2d 520, 524 (S.D.N.Y. 2011) (citing Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993)).

Finally, even if the court does not grant summary judgment co-extensive with the relief sought by either movant, it may

23

provide partial relief. That relief may be as limited as a declaration that one or more material facts are "not genuinely in dispute" and that those facts are deemed "established in the case." Fed. R. Civ. P. 56(g).

## II.  Hana's Motion

In Hana's motion, it seeks summary judgment against the New Trend defendants and the Chang defendants on its first, second, third, fourth, sixth, seventh and eighth claims. (Hana's Notice of Motion). In its first cause of action, Hana seeks a declaration "(1) finding that no party has a superior interest to Hana in the Collateral; (2) finding that Hana is entitled to immediate possession of the Collateral held by New Trend and the Chang Parties; (3) ordering the New Trend Parties and Chang Parties to turnover [sic] the Collateral to Hana; and (4) permitting immediate possession of the cash collateral account as well as monies held in escrow from the sale of Inventory." (Hana Summ. J. Mem. at 3-4; 1st Am. Intervenor Compl. [docket no. 212-8] 10). Hana's second and third causes of action assert breach of contract by JCM and New Trend. (1st Am. Intervenor Compl. 10-11). Similarly, Hana's fourth cause of action asserts that New Trend and Mr. and Mrs. Louie breached their guarantee

24

agreements. (Id. at 11-12). The sixth cause of action asserts a right of replevin against all parties, though Hana presses this claim in its motion only as against the Chang defendants. (Id. at 13). Hana's seventh and eighth causes of action assert claims against Nina Chang and NYCG for conversion and fraudulent conveyance. (Id. at 14-15).

In substance, Hana argues that subsequent to entering into the factoring and loan agreements with the New Trend defendants, Hana perfected its security interest in New Trend's assets, giving it a first-priority interest in the company's inventory as of February 5, 2010, when JCM Logistics defaulted on its loan. Hana argues that it is entitled to summary judgment on its breach-of-contract claims against New Trend, JCM Logistics, and the Louies premised on their defaults on the factoring and loan-guarantee agreements. It further argues that its first-priority interest in New Trend inventory entitles it to a right of replevin, and it asserts that the transfer of New Trend inventory to NYCG and Nina Chang amounted to conversion and a fraudulent conveyance on the part of NYCG and Chang.

The Chen plaintiffs and the Chang defendants each filed an opposition to Hana's motion. The New Trend defendants have not opposed the motion.

In the Chang defendants' opposition, they argue that they paid fair value for the New Trend inventory and, in their purported status as buyers-in-the-ordinary-course, acquired the inventory free of Hana's security interest. (See, e.g., Chang Mem. of Law in Opp'n to Summ. J. 3, 9-12). They also proffer an expert report by forensic audiologist David Smith for purposes of drawing into question the reliability of the taped conversations between Ms. Chang and Mrs. Louie that Mrs. Louie secretly recorded. Hana objects to the admission of that report on the ground that it is untimely and does not comply with Rule 26 disclosure requirements. (Hana Reply to Chang in Support of Summ. J. [docket no. 299] 2-6).

The Chen plaintiffs oppose Hana's motion, arguing that the agreements signed between Hana and New Trend, including the Hana factoring agreement, were invalid because Mr. and Mrs. Louie did not understand the terms of those agreements and did not have the authority to sign on behalf of New Trend. (See generally Wang Decl. dated May 23, 2013).

26

**Assessment of Hana's Motion**

Before reaching the merits of the Hana motion, we address two procedural issues -- first, the Chen plaintiffs' failure to submit a Rule 56.1 Statement in support of their opposition and, second, the Chang defendants' untimely submission of the expert report of David Smith. We then address, in turn, Hana's breach-of-contract, fraudulent-conveyance, conversion, and replevin claims. We leave for last our analysis of Hana's first claim, since that claim hinges on our assessment of the parties' competing claims to the New Trend inventory.

## 1. The Chen Plaintiffs' Failure to Submit a Rule 56.1 Statement in Support of their Opposition to Hana's Motion

As an initial matter, we note that the Chen plaintiffs did not submit a Rule 56.1 Statement in opposition to Hana's motion, as required by Local Civil Rule 56.1(b).

Under the terms of Rule 56.1(b), a party opposing summary judgment is required to include with its papers "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short

27

and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Rule 56.1(d) also provides that "Each statement by the movant… must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)." Failure to comply with these requirements may have dispositive consequences for the litigant. Rule 56.1(c) specifies that if a party opposing summary judgment does not specifically controvert a statement of material fact put forward by the movant, the fact "will be deemed admitted for purposes of the motion."

According to the Second Circuit, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with" Local Rule 56.1. Id. at 73. Thus, "'[w]hile the trial court has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion, it is not required to consider what the parties fail to point out.'" Monahan v. N.Y.C. Dep't of Corr., 214 F.3d 275, 292 (2d Cir. 2000) (quoting Downes v. Beach, 587 F.2d 469, 472 (10th Cir. 1978)). As for the requirement that the party cite to "evidence" for each contention in its Rule 56.1 Statement, the court is permitted to rely solely on the materials that the party cites in deciding

28

whether the party has carried its burden. See, e.g., 24/7 Records, Inc. v. Sony Music Enter., LLC, 429 F.3d 39, 46 (2d Cir. 2005) (quoting Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001) ("A court is not required to consider what the parties fail to point out in their Local Rule 56.1 statements."); Giannullo, 322 F.3d at 142-43 & n.5.

The Chen plaintiffs are represented by able counsel and were unquestionably aware of Local Rule 56.1's requirements, given their submission of a Rule 56.1 Statement in support of their own motion for summary judgment against the New Trend defendants. Under the circumstances, and in the interest of judicial economy, we recommend that the court decline to overlook the Chen plaintiffs' omission of a Rule 56.1 Statement in opposition to Hana's motion. Indeed, based on our review of the full record, as well as our consideration of the Chen plaintiffs' and Chang defendants' respective oppositions to Hana's motion -- discussed below -- we do not believe that excusing the Chen plaintiffs' non-compliance with Local Rule 56.1 would be "in the interest of justice," Wight v. BankAmerica Corp., 219 F.3d 79, 85 (2d Cir. 2000), if, for no other reason, because a more detailed search for evidence in support of their opposition would not alter the outcome of the motion. As we

29

discuss in further detail below, this is because the argument on which they premise their attack on Hana's motion -- that is, that the various agreements between Hana and New Trend were not valid -- is meritless, even accepting as true the facts as alleged by the Chen parties. (See infra 38-41).

## 2. The Chang Defendants' Expert Report

In opposition to Hana's motion, the Chang defendants submitted the declaration of expert witness David Smith, a forensic audio examiner. (See Decl. of Expert Witness David Smith dated May 22, 2013 ("Smith Decl.") [docket no. 295]). The apparent purpose of the declaration is to draw into question the reliability of the audio recordings that purportedly comprise conversations between defendants Byunglim Louie and Nina Chang. The content of those recordings is relevant to Hana's fraudulent-conveyance and conversion claims, as well as to its asserted right to a superior interest in the New Trend inventory over the Chang defendants, in that it may shed light on the parties' good faith. Hana objects to the admission of the Smith declaration, arguing that it is untimely and does not comply with Rule 26(a)(2)(B). (Hana Reply to Chang [docket no. 299], 2-

30

6). We agree with Hana's objections and conclude that the Smith declaration should be precluded.

Pursuant to Rule 26(a)(2)(D) of the Federal Rules of Civil Procedure, a party must disclose expert testimony "at the times and in the sequence that the court orders." Furthermore, Rule 26(a)(2)(B) requires that the written report of a retained expert, such as Mr. Smith, be accompanied by a disclosure, signed by the expert, including:

> (i)    a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> (ii)   the facts or data considered by the witness in forming them;
>
> (iii)  any exhibits that will be used to summarize or support them;
>
> (iv)   the witness's qualifications, including a list of all publications authored in the previous 10 years;
>
> (v)    a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
>
> (vi)   a statement of the compensation to be paid for the study and testimony in the case.

Unless non-compliance with Rule 26(a) is "substantially justified or is harmless," failure to comply with the timing or

substantive requirements governing expert disclosures may trigger Rule 37(c)(1) sanctions. Fed. R. Civ. Pro. 37(c)(1); see Hein v. Cuprum, S.A., De C.V., 53 F. App'x 134, 136 (2d Cir. 2002). Most notably, under Rule 37, it is within the court's discretion to preclude evidence submitted in violation of Rule 26(a) from use on a motion or at trial. Fed. R. Civ. Pro. 37(c)(1); see, e.g., Haas v. Delaware & Hudson Ry. Co., 282 F. App'x 84, 85 (2d Cir. 2008); Fitzpatrick v. Am. Int'l Grp., Inc., 2013 WL 5718465, *3 (S.D.N.Y. Oct. 21, 2013).

Following several adjournments (see Order dated Mar. 30, 2011 [docket no. 29]; Order dated Nov. 3, 2011 [docket no. 108]; Endorsed Order dated Sept. 13, 2012 [docket no. 245]; Order dated Nov. 15, 2012 [docket no. 254]), the final deadline for discovery in this case was February 15, 2013. (Endorsed Order dated Jan. 18, 2013 [docket no. 260]).[3] Nonetheless, the Chang parties never provided any expert-witness disclosure under Rule 26(a)(2)(B), and did not submit Smith's declaration until May 23, 2013, over three months after the close of discovery, and in the midst of summary-judgment briefing. There is no dispute that

---

[3] Our January 18, 2013 Endorsed Order granted Hana's request that the "discovery end-date be extended until 15 February 2013." In the absence of an explicit statement that the extension applied solely to fact discovery, we view the order to have been applicable to both fact and expert discovery.

the Chang defendants did not comply with the court-ordered deadline, did not seek its modification, and have offered no explanation, much less a justification, for their delay. Moreover, Smith's declaration fails to comply with the requirements of Rule 26(a)(2)(B). In particular, although Mr. Smith's résumé states "Recognized as Expert Witness and Forensic Audio Examiner in the United States Federal Court System" and indicates that his clients include "Prosecuting and Private attorneys" (Smith Decl. Ex. A), he fails to set forth a list of all other cases in which he has testified during the previous four years, as required by Rule 26(a)(2)(B)(v). Smith also does not disclose the compensation he is to receive for his report, as required by Rule 26(a)(2)(B)(vi). Furthermore, despite his representation that he has access to sophisticated techniques for adjusting and assessing audio recordings (see Smith Decl. ¶¶ 12, 16), all he offers is the guesswork that some clicks or other sounds in the recordings to which he listened -- which he repeatedly concedes were not the originals -- may suggest editing. (See, e.g., id. ¶¶ 23, 24, 27, 30, 48).

When determining whether to impose sanctions under Rule 37, the pertinent considerations for a court include "(1) the party's explanation for the failure to comply with [Rule 26(a)'s

33

disclosure requirement]; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to meet new testimony; and (4) the possibility of a continuance." Design Strategy, Inc. v. Davis, 469 F.3d 284, 296 (2d Cir. 2006) (quoting Patterson v. Balsamico, 440 F.3d 104, 117 (2d Cir. 2006)) (brackets added). These factors weigh in favor of excluding consideration of Mr. Smith's declaration.

As for the first consideration, the Chang defendants have offered no explanation for their failure to comply with the timing and disclosure requirements of Rule 26(a). Indeed, they do not even seek leave to proffer a tardy expert's report.[4] As for the importance of the proffered testimony, Smith's report adds little to the record in the way of new information or technical guidance. In essence, Smith speculates, without any meaningful explanation, that there may have been some type of digital editing (Smith Decl. ¶ 48; see, e.g., id. at ¶¶ 24

---

[4] It also bears mention that the significance of Mrs. Louie's tape recordings was evident to the parties by late 2011, and Ms. Chang disputed their accuracy in her April 2012 submissions. (See Chang Decl. dated Feb. 10, 2012 at ¶ 37). In short, the Chang defendants were on notice that the reliability of the tapes was at issue more than a year before they proffered the Smith declaration.

34

("possible edit sound occurs"), 27 ("possibly the result of a bad edit"), 30 ("sharp electronic transients may indicate that start/stop or record/pause controls may have been used. This could indicate an edit point.")). He then makes the unexplained leap from vague speculation to certainty, asserting that the recordings are "almost certain to have been edited," for example through the "use of stopping and starting the recording device, or muting the machine's recording capability." (Id. at ¶ 52). Moreover, absent Mr. Smith's report, the Chang defendants would not be left without evidence in support of their assertion that the audio recordings are unreliable. For example, in Nina Chang's deposition, she testified that the audio recordings did not accurately capture her full conversations with Byunglim Louie. (Chang Dep. 171-72 ("it is not a whole conversation, she was putting in the tape, she stop it at some point and we just talk normal and she start maybe and then stop again. It is not a whole conversation."). In addition, evident gaps in a recording or transcript may be viewed by a lay audience as indicators of incompleteness. As for the cause of such gaps, triers of fact can speculate -- just as Smith does -- that this may have been a result of stopping and starting the tape recorder or because of a mechanical malfunction or, perhaps, because of the aural limitations of tape recording from a telephone on speaker-phone

35

et

mode. The audio recordings themselves, as well as the translated transcripts of the recorded conversations, are available to assist the trier of fact in assessing the integrity of the recordings based on perceived audio quality and the relative continuity of the conversations. We therefore conclude that the Smith report is not sufficiently helpful to weigh in favor of excusing its untimely submission.

As for prejudice to Hana and the Chen plaintiffs, the Chang defendants' non-compliance with Rule 26(a) is obviously not harmless. Its effect has been to sandbag the other parties after the motions for summary judgment were filed, depriving them of timely access to Mr. Smith's analysis, on which the Chang defendants now rely in opposing Hana's motion. Were the Chang defendants allowed to use Smith's declaration, it would be necessary to reopen discovery to allow Hana and other parties to hire experts on this issue, to prepare reports and to conduct depositions of Mr. Smith and the other experts.

Furthermore, granting a continuance at this stage for purposes of allowing further expert discovery would prolong what has become a long and tortuous case history, and would reward the Chang defendants for disregarding this court's orders by

36

imposing on the other parties at this late stage the need to invest significant time and expense in the task of assessing and responding to Mr. Smith's untimely report. This not only would undermine the court's ability to manage its schedule, but also would impose a delay that may well have been designed to give the Chang defendants an unwarranted opportunity to forestall resolution of Hana's motion.

In sum, we conclude that the Chang defendants' disregard of the discovery deadline was neither "substantially justified" nor harmless, and, accordingly, we decline to admit the Smith declaration as evidence for purposes of the current motions.

### 3. Hana's Breach-of-Contract Claim

Hana asserts that New Trend, JCM Logistics, and the Louies defaulted on their contractual obligations under the Promissory Note, the New Trend Guarantee agreement, and the Louies' respective individual guarantee agreements. By stipulation, the New Trend parties have admitted this default. (See Lee Decl. dated Apr. 15, 2013, Ex. G ¶ 5(b)).

37

The Chen plaintiffs oppose this aspect of Hana's motion, arguing that the Hana factoring agreement was invalid because (1) Kisum and Byunglim Louie did not read or understand the terms of that agreement when they entered into it (see Wang Decl. dated May 23, 2013, ¶¶ 3-6), (2) Byunglim Louie did not hold a formal title at New Trend and thus lacked the authority to sign on the company's behalf (id. at ¶¶ 7-10), and (3) Kisum Louie was prohibited by the terms of his agreement with Chen from unilaterally accepting loans. (Id. at ¶ 12). Each of these arguments is unavailing.

With respect to the Chen plaintiffs' first attack on the Hana factoring agreement, it is firmly established under New York law that a party remains bound by the terms of an agreement, irrespective of whether he or she failed to read the contract or was unaware of its terms at the time that he or she entered into it. See Pimpinello v. Swift & Co., 253 N.Y. 159, 162-63, 170 N.E. 530, 531 (1930) ("If the signer could read the instrument, not to have read it was gross negligence; if he could not read it, not to procure it to be read was equally negligent; in either case the writing binds him."); KMK Safety Consulting, LLC v. Jeffrey M. Brown Assoc., Inc., 72 A.D.3d 650, 651, 897 N.Y.S.2d 649 (2d Dep't 2010); Dunn v. Northgate Ford,

38

Inc., 16 A.D.3d 875, 878, 794 N.Y.S.2d 449, 451 (3d Dep't 2005);
Sofio v. Hughes, 162 A.D.2d 518, 519, 556 N.Y.S.2d 717, 718 (2d
Dep't 1990).

As for the Chen parties' remaining objections to the Hana
factoring agreement -- that Byunglim did not have a formal title
at New Trend and that Kisum Louie was contractually prohibited
through his agreement with Chen from unilaterally undertaking
debts for the company -- both arguments amount to an assertion
that the Louies lacked authority to enter into the agreement.
However, the question of whether they lacked actual authority --
a seemingly tenuous argument -- is irrelevant to the validity of
the Hana factoring agreement, since, at a minimum, the Louies
each had the apparent authority to contractually bind New Trend.

In the Chen plaintiffs' Third Amended Complaint, they
stated that, pursuant to Chen's agreement with Kisum Louie,
"Louie would hold the office of the President [of New Trend] but
would merely function as a sales person to conduct sales for the
company." (3d Am. Compl. ¶ 23). Notwithstanding this language,
New York recognizes "a general presumption that the president of
a corporation is clothed with the powers which, of necessity,
inhere in the position of chief executive," Odell v. 704

39

Broadway Condo., 284 A.D.2d 52, 56, 728 N.Y.S.2d 464 (1st Dep't 2001), including the power "to make contracts relating to the business and its operations." Merrell-Benco Agency, LLC v. HSBC Bank USA, 20 A.D.3d 605, 609, 799 N.Y.S.2d 590, 593 (3d Dep't 2005). As such, Kisum Louie's role as the president of New Trend -- even if that role was believed by Chen to be only nominal -- was sufficient to establish Kisum Louie's apparent authority to enter into the Hana factoring agreement, and New Trend remains bound by Mr. Louie's undertaking.

In addition, Kisum Louie involved his wife in the contracting process, in effect holding her out to Hana as New Trend's secretary. (See, e.g., Sheppard Decl. dated Apr. 16, 2013, Ex. 1 at "Signature Card" (signed by Kisum Louie, as president, and Byunglim Louie, as secretary, stating "We hereby certify that the specimen signatures below are the genuine signatures of the duly elected and qualified officers and of duly appointed agents, respectively…")). Since such conduct on the part of the company's president gave rise to the appearance that Byunglim Louie possessed the authority to enter into the transaction, New Trend remains bound by her signature, irrespective of whether she in fact held an official corporate title. See Hallock v. State, 64 N.Y.2d 224, 231, 485 N.Y.S.2d

510, 513 (1984) ("Essential to the creation of apparent authority are words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction.").

In sum, we conclude that the Chen plaintiffs have failed to raise any valid objections to the Hana factoring agreement. We also note, as an aside, that it is not at all clear that the Chen plaintiffs are entitled to challenge the validity of the Hana factoring agreement, to which they are not parties, Decolator, Cohen & DiPrisco, LLP v. Lysaght, Lysaght & Kramer, P.C., 304 A.D.2d 86, 90, 756 N.Y.S.2d 147, 150 (1st Dep't 2003) ("to have standing to challenge a contract, a non-party to the contract must either suffer direct harm flowing from the contract or be a third-party beneficiary thereof"); Gawez v. Inter-Connection Elec., Inc., 9 Misc. 3d 1107(A), 806 N.Y.S.2d 444, 2005 WL 2219688, *11 (Sup. Ct. Kings Cnty. 2005), aff'd, 44 A.D.3d 898, 845 N.Y.S.2d 367 (2d Dep't 2007), but, in any event, we find their objections to be meritless.

In light of that conclusion, it is apparent that none of the challenging parties have put forward any competent evidence to refute the validity of the agreements between Hana and the

41

New Trend parties, or to draw into question the New Trend parties' admitted breach of those agreements.[5] In the absence of any genuine dispute on these issues, we conclude that Hana has established its breach-of-contract claims beyond triable dispute. See Exp.-Imp. Bank of U.S. v. Agricola Del Mar BCS, 536 F. Supp. 2d 345, 349 (S.D.N.Y. 2008), aff'd, 334 F. App'x 353 (2d Cir. 2009).

## 4. Hana's Fraudulent-Conveyance Claim

Hana also seeks summary judgment on its fraudulent-conveyance claim against the Chang defendants for the transfer of inventory from New Trend to NYCG in or about the end of 2010. It asserts this claim under theories of either actual or constructive fraud.[6] (See Hana Mem. of Law in Supp. of Summ. J.,

---

[5] We note that although the Chang defendants question Hana's rights to the inventory (Chang Mem. of Law in Opp'n to Hana Summ. J. Mot. 16 ("even if Hana did have a security interest of some kind in the property")), they fail to point to any evidence that might demonstrate a genuine factual dispute as to the priority of Hana's claim to the property. (Id.; see generally Chang R. 56.1 Opp'n Statement).

[6] The Chang defendants have taken issue with Hana's assertion of two alternative theories of its fraudulent-conveyance claim, arguing that Hana's amended complaint put forward only a claim of actual fraud. (Chang Mem. of Law in Opp'n to Summ. J. Mot. 16-17). This argument is unavailing, however, because, as the Second Circuit has made clear, "the essence of a cause of action is found in the facts alleged and proven by the plaintiff, not the particular legal theories

42

10-12; 1st Am. Intervenor Compl., 14-15). We conclude that triable issues of material fact preclude such summary relief.

### a. Actually-Fraudulent Conveyance Under DCL § 276

Hana argues that the transfer of inventory from New Trend to NYCG in or about the end of 2010 violated New York Debtor and Creditor Law ("DCL") § 276 in that the transfer was made with an actual intent to defraud Hana. It also argues that there are "badges of fraud" that support an inference of such fraudulent intent. (Hana Summ. J. Mem. of Law 13). Specifically, it points to the "close relationship between the parties," arguing that Ms. Chang was the CFO of New Trend, "or at least an employee who maintained the books and records of a small, closely held corporation." (Id.). It also argues that there was inadequate consideration, in particular noting that Ms. Chang has admitted that $400,000.00 remains owing to New Trend for the inventory that NYCG acquired. (Id. at 14). Hana also relies on the tape recordings of conversations between Mrs. Louie and Ms. Chang as evidence of inadequate consideration and as evidence that the invoices produced by the Chang defendants were fabricated. (Id.).

articulated." Oneida Indian Nation of New York v. Cnty. of Oneida, 617 F.3d 114, 139 (2d Cir. 2010).

The Chang defendants argue that Hana has failed to carry its burden of proof of an actually-fraudulent conveyance, and they further argue that even if New Trend did engage in such conduct, the Chang parties "are entitled to the special protective carve-out for innocent purchasers for value[,] pursuant to N.Y. DCL § 278." (Chang Mem. of Law in Opp'n to Summ. J. 17).

Under New York law, fraud will be demonstrated if a party conveys property with actual intent "to hinder, delay, or defraud either present or future creditors." N.Y. Debt. & Cred. Law § 276. "If actual fraud is established, the adequacy of consideration and the solvency of the transferor is immaterial." In re Le Café Crème, Ltd., 244 B.R. 221, 239 (Bankr. S.D.N.Y. 2000); Wall St. Assocs. v. Brodsky, 257 A.D.2d 526, 529, 684 N.Y.S.2d 244, 247 (1st Dep't 1999).

"'To prove actual fraud under § 276, a creditor must show intent to defraud on the part of the transferor.'" In re Sharp Int'l Corp., 403 F.3d 43, 56 (2d Cir. 2005) (quoting HBE Leasing Corp. v. Frank, 61 F.3d 1054, 1059 n.5 (2d Cir. 1995)) (emphasis added); In re Dreier LLP, 452 B.R. 391, 401 (Bankr. S.D.N.Y. 2011) ("'mutual fraudulent intent' is not necessary"). Moreover,

44

it must do so through clear and convincing evidence. <u>HBE Leasing Corp. v. Frank</u>, 48 F.3d 623, 639 (2d Cir. 1995).[7]

Actual fraudulent intent may be "inferred from the circumstances surrounding the transaction." <u>Id.</u>; see <u>In re Sharp Int'l Corp.</u>, 403 F.3d at 56 (quoting <u>Wall St. Assocs.</u>, 257 A.D.2d at 529, 684 N.Y.S.2d at 247). Thus, courts have recognized certain so-called badges of fraud as evidence of actual fraudulent intent, including "1) inside transactions among related entities, 2) hasty transfers made outside the ordinary course of business, 3) inadequate or lack of consideration, 4) secret transfers, 5) retention of control by the transferor, and 6) creation of a shield of property from creditors." <u>Universitas Educ., LLC v. Nova Grp., Inc.</u>, 2013 WL 6123104, *9 (S.D.N.Y. Nov. 20, 2013); see <u>Dempster v. Overview Equities, Inc.</u>, 4 A.D.3d 495, 498, 773 N.Y.S.2d 71, 74 (2d Dep't 2004).

Hana relies primarily on an argument that actual intent is established here through contextual evidence or "badges of

---

[7] With respect to DCL § 276, "[t]he intent of the transferee only becomes relevant as an affirmative defense." <u>In re Jacobs</u>, 394 B.R. 646, 659 (Bankr. E.D.N.Y. 2008) (quoting <u>Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.</u>, 234 B.R. 293, 318 (Bankr. S.D.N.Y. 1999)).

fraud." In doing to, it points to the purportedly close relationship between the New Trend and Chang parties and to the alleged inadequacy of consideration. (Hana Summ. J. Mem. of Law 13).

With respect to the closeness between New Trend and NYCG, Hana concedes that it is a disputed question whether Ms. Chang was a corporate insider at New Trend. (Id.). While New York law acknowledges a need for special scrutiny where conveyances have been made to members of the same family or to individuals undisputedly qualifying as corporate insiders, see, e.g., Mega Pers. Lines, Inc. v. Halton, 9 A.D.3d 553, 555, 780 N.Y.S.2d 409, 411 (3d Dep't 2004); Morgenthau v. A.J. Travis Ltd., 184 Misc. 2d 835, 842, 708 N.Y.S.2d 827, 831 (Sup. Ct. New York Cnty. 2000), Hana has failed to demonstrate beyond triable dispute that the relationship at issue in this case qualified as such a relationship.

As for the adequacy of consideration, we conclude that it is beyond triable dispute that consideration was inadequate. (See infra 68-77). However, as we now discuss, Hana has failed to establish beyond triable dispute that the conveyance was made with an actual intent to defraud.

This case is somewhat unusual in that there is direct evidence of New Trend's actual intent, namely Byunglim Louie's testimony that, while acting on behalf of New Trend, she specifically intended to transfer inventory to NYCG for the purpose of defrauding creditors. (See, e.g., Sheppeard Decl. dated Apr. 16, 2013 at Ex. 8). The question is whether such self-inculpatory testimony by the transferor precludes a triable issue on the question of the transferor's intent at the time of the transfer. The Chang defendants have sought to portray Mrs. Louie's more recent testimony as backing away from her prior admission (see Chang Decl. dated May 23, 2013 at ¶ 60), and they have attacked her overall credibility. (See, e.g., id. at ¶¶ 110-19). We simply disagree with the Chang defendants that Mrs. Louie's more recent testimony could be read in any way to suggest that she has retreated from her admission of fraudulent conduct. However, in view of the apparent credibility issues raised by Mrs. Louie's and Ms. Chang's sharply contradictory versions of events surrounding the inventory transfer, which we describe in further detail below, we agree that summary judgment on the issue of actual fraudulent transfer would be inappropriate.

47

Mrs. Louie and Ms. Chang apparently met and became friendly in 2009, while working at the same warehouse in New Jersey. (Byunglim Louie Aff. dated Dec. 21, 2011 at ¶ 4; Chang Decl. dated Feb. 10, 2012 at ¶ 6). According to Mrs. Louie, in the months of April, May, June and July 2010

> Nina Chang agreed to review the financial operations of New Trend Apparel and convert to a new computerized accounting system. She performed this work at her home and she advised me that she had to pay others to help her. Nina Chang operated her accounting services under the name of [her company] Pritee. From April 2, 2010 to July 23, 2010, New Trend paid Pritee a total of $25,600.

(Byunglim Louie Aff. dated Feb. 15, 2012 at ¶ 7). Mrs. Louie stated that, in early 2010, New Trend hired Ms. Chang as its Chief Financial Officer. (Byunglim Louie Aff. dated Dec. 21, 2011 at ¶ 6; Byunglim Louie Aff. dated Feb. 15, 2012 at ¶ 8). Susan Lee, who served as Hana's representative during negotiations with New Trend, also testified that Ms. Chang and the Louies had represented to her that Ms. Chang was the CFO of New Trend. (See Chang Decl. dated May 23, 2013 at Ex. B, ("Lee Oct. 25, 2012 Dep.") pp. 48-49). In contrast, Ms. Chang asserted that that she "was never the Chief Financial Officer of New Trend," adding, "I was not an officer of the corporation and I did not have any ownership interest in New Trend." (Id. at ¶ 9). Ms. Chang further asserted that Mr. and Mrs. Louie "never even

48

allowed [her] to access all of New Trend's financial records."
(Chang Decl. dated Feb. 10, 2012 at ¶ 8). She stated that, as a
New Trend employee, she "performed various administrative and
human resource duties, liaised with New Trend's factors,
attempted to find New Trend a new factor, and looked over
records pertaining to [Mr. Louie's] children in China[,] who
operated his factories and [who] he was afraid was stealing from
him." (Chang Decl. dated Feb. 10, 2012 at ¶ 8).

Mrs. Louie testified that Ms. Chang received a salary of
$2,000.00 per week, and

> also continued to receive payments she requested for
> [Ms. Chang's company] Pritee and she was also given
> access to two [New Trend] company credit cards. She
> continued to use the credit cards after the conveyance
> of inventory to New York Clothing Group in October
> 2010.

(Byunglim Louie Aff. dated Feb. 15, 2012 at ¶ 8). Mrs. Louie
produced credit card receipts for December 2010 and January 2011
showing that Ms. Chang had charged $6,702.68 in November 2010,
$4,168.52 in December 2010, and $1,687.87 in January 2011, and
Mrs. Louie notes that these amounts include over $5,000.00 in
purchases as Bloomingdales. (Id. at ¶ 8 and Ex. 2). However, Ms.
Chang testified at her deposition that those expenses had been

49

business expenses made for the benefit of New Trend, including the purchase of clothing samples from Bloomingdales that she had made together with Mrs. Louie. (Chang Dep. 215-19).

Mrs. Louie asserts that when New Trend began to experience financial difficulties in the middle of 2010, "Nina Chang proposed to move New Trend Apparel inventory to another location. She indicated that Hana Financial would place a lien on inventory if the Hana Financial loan to New Trend Apparel was not paid." (Byunglim Louie Aff. dated Dec. 21, 2011 at ¶ 10). Mrs. Louie further states that Ms. Chang advised her that if New Trend transferred its inventory to NYCG, Ms. Chang could use it as leverage to secure a large loan that New Trend could use to satisfy its creditors. (Id. at ¶ 11). Mrs. Louie asserts that Ms. Chang had assured her that she intended to assign NYCG to New Trend after two years. (Id.).

In contrast, Ms. Chang testified that, based on events that she witnessed while working at New Trend, it was her understanding that the Louies had decided to wind up New Trend around October 2010 because of a combination of family problems -- including Mrs. Louie's diagnosis with cancer, Mr. Louie's old age, and infighting among members of Mr. Louie's family in China

50

-- and a failing business model, in which Mr. Louie sold inventory for no profit or at a loss, in order to increase New Trend's brand recognition and sales volume. (Chang Decl. dated Feb. 10, 2012 at ¶¶ 15, 16, 17, 21, 63-64; Chang Decl. dated Feb. 10, 2012 at Ex. B). Ms. Chang asserts that she had "already begun formulating the idea for [her] own garment business" when she learned that New Trend would be closing down. She further states that, in mid-2010, Mr. Louie "began contacting several closeout companies to attempt to liquidate New Trend's inventory. He contacted major inventory liquidators such as One Step Up and Bemco." (Chang Decl. dated Feb. 10, 2012 at ¶ 18). She asserts that she "purchased inventory for the same price and value that New Trend was selling to all other closeout buyers." (Chang Decl. dated Feb. 10, 2012 at ¶ 35). Specifically, she stated that she

> decided to purchase some inventory from New Trend, and in late September of early October 2010, Byunglim and I negotiated a price for 979,658 pieces. Byunglim prepared invoices and faxed them to me shortly thereafter. We agreed on a price of $729,643.20 for the inventory, which was to be paid within 120 days from delivery This price was admittedly a closeout price, but at the time New Trend was selling almost its entire inventory in closeout sales. New Trend shipped the inventory to NYCG in or about October or November 2010.

(Id. at ¶ 22).

51

Ms. Chang has produced copies of the Bill of Sale, invoices, and bills of lading that purportedly show a sale of inventory by New Trend to NYCG, as well as credit memos purportedly representing amounts refunded to NYCG for faulty merchandise. (See Chang Decl. dated Feb. 10, 2012 at Exs. C-E). She has conceded, however, that she still has not paid New Trend more than $400,000.00 of the asserted purchase price. (Chang Dep. 137). Mrs. Louie stated in her affidavit that "the conveyances to New York Clothing Group Inc. were all made without consideration." (Byunglim Louie Aff. dated Dec. 21, 2011 at ¶ 12). However, in her deposition testimony, she acknowledged that she in fact did receive some cash payments from Ms. Chang. (Byunglim Louie Dep. 123-24).

Mrs. Louie also testified that New Trend made three sets of transfers of inventory to NYCG between about October 2010 and January 2011. (Byunglim Louie Aff. dated Dec. 21, 2011 ¶ 12). She further asserts that, between December 2010 and January 2011, New Trend transferred three shipping containers of inventory to NYCG, for no consideration. (Id. at ¶ 15). In contrast, Ms. Chang testified that all of the inventory that NYCG acquired from New Trend was transferred between October and November 2010, as part of a single purchase. (See Chang Dep. 89-

52

90). Mrs. Louie explicitly acknowledges that she and Ms. Chang "are in disagreement as [to] whether additional inventory was transferred" following a first set of shipments in October and November 2010. (Byunglim Louie Aff. dated Feb. 15, 2012 at ¶ 18).

Mrs. Louie also testified that, in December 2010, New Trend received orders for $108,000.00 in merchandise from bona fide buyers but that, upon Ms. Chang's advice, she canceled the orders and transferred inventory to NYCG in January 2011, purportedly so that NYCG could fill the canceled orders. (Id. at ¶ 16). Similarly, Mrs. Louie testified that Ms. Chang told her to cancel an order for $300,000.00 from Ross Stores in late 2010 so that NYCG could fill the order. (Id. at ¶ 15). Ms. Chang expressly denies that she advised New Trend or Mrs. Louie to cancel any orders so that NYCG could fill them. (Chang Decl. dated Feb. 10, 2012 at ¶ 40).

Mrs. Louie insists that, for the October and November 2010 shipments, she and Ms. Chang "agreed to create invoices that purported to show a sale," stating that the "quantity of merchandise shown on the invoices is correct but the Unit Price was fabricated and far below actual value." (Byunglim Louie Aff.

53

dated Feb. 15, 2012 at ¶ 13 & Ex. 2). She further asserts that the true wholesale, fair-market value of the inventory transferred in October and November 2010 was approximately $3 million, while the base cost, including manufacturing, duty, and shipping costs was about $1.8 million. (See Byunglim Louie Aff. dated Dec. 21, 2011 at ¶ 13). Neither she nor Hana has offered any competent evidence to corroborate these asserted values. Mrs. Louie also testified that on August 17, 2011, she met with Ms. Chang and signed a "false and inaccurate" document that "purported to show New York Clothing Group Inc. purchased inventory from New Trend Apparel Inc." (Id. at ¶ 17). Specifically, she testifies that she signed a bill of sale, some credit memos, and receipts while "in a supermarket parking lot in Ridgefield, NJ," and she asserts that "[t]here was no notary present." (Byunglim Louie Aff. dated Feb. 15, 2012 at ¶ 30). She states that, in November 2011, she met once more with Ms. Chang and signed a cash receipt, when no notary was present. (Id.). Mrs. Louie testified that she "signed all of the documents and then Nina Chang took possession of them. When I asked her to provide copies, she refused." (Id.).

Ms. Chang denies that she ever arranged for the creation or signing of bogus sales documents. Rather, she retorts that she

54

never falsified documents evidencing the sale of
inventory to NYCG. Byunglim signed a bill of sale from
New trend to NYCG in October 2010. This bill of sale
was notarized long before August 2011 when Byunglim
claims I compelled her to sign documents regarding the
sale of inventory from New Trend to NYCG.

(Chang Decl. dated Feb. 10, 2012 at ¶ 35).


In sum, Ms. Chang and Mrs. Louie offer materially different
narratives concerning Ms. Chang's role at New Trend, as well as
the transfer of inventory from New Trend to NYCG.


The secretly-recorded tapes of Korean-language
conversations between Mrs. Louie and Ms. Chang, as well as the
competing English-language translations of those conversations,
provide additional evidence of the interactions between the New
Trend defendants and the Chang defendants that are at issue in
this case. However, those tapes and transcriptions are also a
subject of significant dispute among the parties. For example,
the Chang defendants have put forward evidence suggesting that
the tapes may be incomplete and inaccurate recordings of the
women's true conversations. (See, e.g., Chang Decl. dated May
23, 2013 at ¶34-36; Chang Dep. 171-76 ("Q. … You are saying that
the conversation you had earlier with Mrs. Louie, whether it was
earlier that day or a couple of days earlier was inconsistent

55

from what the tape recordings were. A. Yes."). It also bears mention that the original audio-files were created and controlled by Mrs. Louie, who reportedly transferred them from her mp3-recorder to her computer and then saved them to CD. (See Weissman Feb. 28, 2012 letter to opposing counsel [docket no. 160-8]). Viewed in the light most favorable to the Chang defendants, a factfinder could infer, as the Chang defendants have suggested (Chang Decl. dated May 23, 2013 at 9-11), that the original recordings had been tampered with by Mrs. Louie and thus were unreliable. See, e.g., United States v. Tropeano, 252 F.3d 653, 661 (2d Cir. 2001) (the ultimate issue of reliability of tapes is left to the factfinder and may be challenged on cross-examination); United States v. Gigante, 538 F.2d 502, 505 (2d Cir. 1976) ("Tape recorded evidence is uniquely susceptible to manipulation and alteration. Portions of a conversation may be deleted, substituted, or rearranged.").

In addition, the parties' translations of the tapes conflict for certain portions of the tape that Hana cites in support of its motion. Moreover, the difference in translation of a few segments reflect potentially material disputes, since they portray strikingly different versions of Ms. Chang's intent. (Compare Sheppeard Decl. dated Apr. 16, 2013 at Ex. 19

56

pp. 7 ("Woman 2 [purportedly Mrs. Louie]: … Do you mean that I should sign that I received the money while I have not received the money? Do you think it is better? Woman 1 [purportedly Ms. Chang]: No, You have no other choice. Based on the documents, there is $1,000,000 that I must pay you. Right?") with Chang Supplemental Decl. dated Mar. 7, 2012 at Ex. E pp. 9-10 ("UF2 [purportedly Mrs. Louie]: Oh… are you telling me that I should sign [a document indicating] that I received the money, which I did not receive? Do you think it is better? UF1 [purportedly Ms. Chang]: No… It must be true."; see also Hana Summ. J. Mem. of Law at 14 (citing Hana's version of the translated dialogue)). It is the duty of the factfinder to resolve such conflicts and to ascertain what weight and meaning to ascribe to the competing translations. See In re Audibility of Certain Recorded Conversations, 691 F. Supp. 588, 601 (D. Conn. 1988) (Where, "as here, there is a dispute about which of the transcripts and/or translations is accurate, it is for the jury to decide which of the transcriptions and translations -- if either -- to credit."); see United States v. Ben-Shimon, 249 F.3d 98, 101 (2d Cir. 2001).[8]

---

[8] We note that, in contrast with our April 20, 2012 Report and Recommendation, which discussed the tape-recording evidence and in which the issue was whether there was a likelihood of Hana's success on the merits (see Report & Recommendation dated

We note that, other than the translated tapes, Hana has produced little documentary evidence to corroborate Mrs. Louie's version of events, such as, for example, documents showing the dates and number of inventory transfers to NYCG, or confirming that New Trend canceled orders with its customers. In drawing attention to this lack of evidence, Ms. Chang testified that a transfer of inventory worth approximately $3 million, such as that reported by Mrs. Louie, "would fill approximately 30 shipping containers and numerous tracker trailers. [sic] There would be an enormous paper trail including bills of lading, warehouse receipts, trucking receipts, packing receipts, etc." (Chang Decl. dated Feb. 10, 2012 at ¶ 32).

Viewing the record as a whole and in the light most favorable to the Chang defendants, we conclude that Hana falls short of demonstrating, beyond triable dispute and by clear and convincing evidence, that New Trend acted with actual fraudulent intent. While it is true that Mrs. Louie is the only party with true knowledge of her state of mind at the time that New Trend conveyed inventory to NYCG, the factfinder of course is not

Apr. 20, 2012 at 36-40); Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 34 (2d Cir. 2010)), the question currently before us is whether Hana has established the facts underlying its claim beyond triable dispute. See Shade, 251 F.3d at 314.

58

required to credit her disputed testimony as to those events. See, e.g., In re Dana Corp., 574 F.3d 129, 147 (2d Cir. 2009); see also Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150-51 (2000) (discussing credibility of evidence in the context of Rule 50 motion, and acknowledging that the inquiry is the same under Rule 56).[9] Since Mrs. Louie and Ms. Chang offer vastly different versions of the nature of the transaction between New Trend and NYCG (compare Lee Decl. dated Apr. 15, 2013, Ex. I with Chang Decl. dated May 23, 2013), it falls to the trier of fact to assess the credibility of their respective stories. Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005). In addition, in determining whether the transfers between New Trend and NYCG were marked by the badges of fraud, the factfinder will need to assess the validity of the disputed invoices purporting to represent NYCG's purchases from New Trend (see Chang Decl. dated Feb. 10, 2012 [docket no. 140], Ex. F),

---

[9] We of course acknowledge that Mrs. Louie's statements about her fraudulent intent are, at least on their face, against her pecuniary interest, and may therefore be viewed as particularly credible. That said, a trier of fact could find -- based on Ms. Chang's testimony and the remaining evidence -- that both women acted with honest intent at the time and could further infer that Mrs. Louie's current version of events, even though inculpatory of herself as well as of Ms. Chang, is motivated by a desire to curry favor with Hana and thereby potentially leave Ms. Chang and her company as Hana's principal targets.

59

which Mrs. Louie alleges were forged; the competing translations
of the taped Korean-language conversations between Mrs. Louie
and Ms. Chang; and the completeness of the original audio
recordings themselves -- all of which remains in dispute.

For these reasons, we recommend that summary judgment be
denied on Hana's claim of an actual fraudulent transfer.

### b. Constructively-Fraudulent Conveyance Under DCL § 273

Hana also argues that the Chang defendants are liable under
a theory of constructively-fraudulent conveyance. It asserts
that the Chang defendants failed to pay fair consideration for
the New Trend inventory and acted in bad faith. (Hana Mem. of
Law in Supp. of Summ. J., 15). In particular, Hana argues that
the Chang defendants had knowledge of New Trend's unfavorable
financial condition at the time of the transfer, and that the
conveyance by New Trend to NYCG left New Trend insolvent and
unable to meet its financial obligations. (Id.). In addition,
Hana argues that the Chang defendants did not pay adequate
consideration for the New Trend inventory. (Id. at 16).

        The Chang defendants dispute that Hana has carried its
burden of establishing that New Trend was insolvent during the
relevant period and that the Chang defendants failed to pay fair
consideration for the New Trend inventory. They argue that Hana
"presents neither a financial analysis of the books and records
of New Trend or any expert testimony to support their very
important claim that New Trend was insolvent," instead relying
exclusively on the affidavit of Byunglim Louie. (Chang Mem. of
Law in Opp'n to Summ. J. 21). They also argue that Ms. Chang was
in the process of paying New Trend over time but was prevented
from completing the payments due to the court-imposed TRO. (Id.
at 19).


        Hana bases its constructively-fraudulent-conveyance claim
on DCL § 273 (see Hana Mem. of Law in Supp. of Summ. J., 15-16),
which states "[e]very conveyance made and every obligation
incurred by a person who is or will be thereby rendered
insolvent is fraudulent as to creditors without regard to his
actual intent if the conveyance is made or the obligation is
incurred without fair consideration." N.Y. Debt. & Cred. Law §
273.[10]

---

        [10] New York also recognizes theories for constructive fraud
if  a  defendant  transferred  property  for  less  than  fair
consideration  "while  it  suffered  from  unreasonably  small

"Whether the subject conveyance has rendered the debtor insolvent, and whether fair consideration was paid, are generally questions of fact which must be determined under the circumstances of the particular case" and, generally, "the burden of proving these elements is upon the party challenging the conveyance." Joslin v. Lopez, 309 A.D.2d 837, 838, 765 N.Y.S.2d 895, 897 (2d Dep't 2003). However, when a transfer has been made for no consideration, the courts recognize a rebuttable presumption of insolvency and fraudulent transfer, and the burden then shifts to the transferee to overcome that presumption. See, e.g., Elliott v. Elliott, 365 F. Supp. 450, 454 (S.D.N.Y. 1973); Shelly v. Doe, 249 A.D.2d 756, 757, 671 N.Y.S.2d 803, 805 (3d Dep't 1998); Miner v. Edwards, 221 A.D.2d 934, 634 N.Y.S.2d 306, 307 (4th Dep't 1995); State v. First Investors Corp., 156 Misc. 2d 209, 218, 592 N.Y.S.2d 561, 568 (Sup. Ct. New York Cnty. 1992) (citing Cole v. Tyler, 65 N.Y. 73, 77-78 (1875)). If the burden of proof is shifted to the transferee, the transferee "need only come forward with some evidence… to rebut the presumption, as the burden of persuasion and the risk of non-persuasion remain with the party challenging

_____

capital[] or while it knew that it would be unable to pay debts as they became due." In re Le Café Crème, Ltd., 244 B.R. at 240-41; N.Y. Debt. & Cred. Law §§ 274, 275. However, Hana does not rely on either of these provisions in support of its motion. (See Hana Mem. of Law in Supp. of Summ. J., 15-16).

the conveyance." See In re Nirvana Rest. Inc., 337 B.R. 495, 505 (Bankr. S.D.N.Y. 2006).

### i. Insolvency

Under New York law, "[i]nsolvency is present when the fair value of [the debtor's] salable assets is less than the amount required to pay existing debts as they become due." Ede v. Ede, 193 A.D.2d 940, 941, 598 N.Y.S.2d 90, 92 (3d Dep't 1993) (citing N.Y. Debt. & Cred. Law § 271); Murin v. Estate of Schwalen, 31 A.D.3d 1031, 1032, 819 N.Y.S.2d 341, 343 (3d Dep't 2006). The "'operative reference point for determining insolvency is the time at which the transfer took place'" and "'insolvency of the transferor... cannot be presumed from subsequent insolvency at a later point in time.'" In re Chin, 492 B.R. 117, 127 (Bankr. E.D.N.Y. 2013) (ellipsis in original) (quoting In re Trinsum Grp., Inc., 460 B.R. 379, 392 (Bankr. S.D.N.Y. 2011)).

The DCL's measure of insolvency focuses on companies in serious overall financial trouble, as opposed to companies experiencing a temporary lack of liquidity. See Kreps v. C. I. R., 351 F.2d 1, 9 (2d Cir. 1965) (distinguishing the "bankruptcy test" for insolvency from the "equity test"); In re Chin, 492

B.R. at 127. For this reason, under the DCL, "[c]ash flow is not a factor, and an 'inability to pay current obligations as they mature does not show insolvency.'" Morgan Guar. Trust Co. v. Hellenic Lines Ltd., 621 F. Supp. 198, 220 (S.D.N.Y. 1985) (quoting McCarty v. Nostrand Lumber Co., 232 A.D. 63, 248 N.Y.S. 606 (2d Dept. 1931)); see In re Trinsum Grp., Inc., 460 B.R. at 392 (New York's insolvency test parallels the "balance sheet" test under the United States Bankruptcy Code). Thus, while liquidity may be considered in assessing the fair market value of assets, see, e.g., U.S. Trust Co. of N.Y. v. Gill & Duffus, Inc., 189 A.D.2d 655, 656, 592 N.Y.S.2d 327 (1st Dep't 1993), illiquidity apparently is not dispositive of insolvency under the DCL, since an inability to pay debts as they come due is not sufficient evidence of insolvency. See, e.g., In re Chin, 492 B.R. at 127; Lippe v. Bairnco Corp., 249 F. Supp. 2d 357, 379 (S.D.N.Y. 2003), aff'd, 99 F. App'x 274 (2d Cir. 2004) (solvency calculation included value of insurance coverage and reserve funds, in addition to cash and liquid assets).

"It is the fair saleable value of assets, not their book value, that determines insolvency." Morgan Guar. Trust Co., 621 F. Supp. at 220. Still, "[a]lthough book value does not ordinarily reflect an accurate market value, book value

nevertheless provides some evidence of the debtor's solvency."
In re Nirvana Rest. Inc., 337 B.R. at 506.

"To be 'salable' an asset must have 'an existing and not
theoretical market.'" Moody v. Sec. Pac. Bus. Credit, Inc., 971
F.2d 1056, 1067 (3d Cir. 1992) (discussing § 4 of the Uniform
Fraudulent Conveyance Act, the analogue to DCL § 273) (quoting
United States v. Gleneagles Inv. Co., Inc., 565 F. Supp. 556,
578 (M.D. Pa. 1983)), aff'd sub nom. United States v. Tabor
Court Realty Corp., 803 F.2d 1288 (3d Cir. 1986)); see In re
Morra, 2009 WL 2226124, *7 (Bankr. E.D.N.Y. July 21, 2009)
(future earnings of at-will employee are not a salable asset);
Ede, 193 A.D.2d at 942, 598 N.Y.S.2d at 92 (1993) (future
interest subject to parents' life estate is "an interest so
inchoate, uncertain and contingent in nature as to clearly lack
a present fair salable value").

In support of its constructively-fraudulent-conveyance
claim, Hana relies solely on Mrs. Louie's affidavit as the
evidentiary basis for its assertion that New Trend was rendered
insolvent by its transfer of inventory to NYCG.[11] (See Hana Mem.

---

[11] We also note that Hana does not assert in its Rule 56.1
Statement that New Trend was rendered insolvent by the transfer
to NYCG, but rather does so only in its memorandum of law.

of Law in Supp. of Summ. J., 15 (citing Aff. of Byunglim Louie dated Dec. 21, 2011 at ¶¶ 8-12)).[12] On the issue of insolvency, Mrs. Louie's affidavit is entirely conclusory. (See Aff. of Byunglim Louie dated Dec. 21, 2011 at ¶1). Moreover, the portions of Mrs. Louie's affidavit that Hana cites as evidence of New Trend's inability to meet its financial obligations at the time of the conveyance do not directly speak to the issue of solvency. (See id. at ¶¶ 8-12). In light of the extensive credibility issues at play given Mrs. Louie's and Ms. Chang's differing renditions of events, such evidence is clearly insufficient to establish New Trend's insolvency beyond triable dispute. See, e.g., The Estate of Mantle v. Rothgeb, 2007 WL 4510326, *4 (S.D.N.Y. Dec. 21, 2007), modified on reconsideration, 537 F. Supp. 2d 533 (S.D.N.Y. 2008) ("Because Mr. Rothgeb is a defendant in this action, the Court concludes that 'there are "specific bases for possible impeachment,"' regarding his declaration."); Wantanabe Realty Corp. v. City of New York, 315 F. Supp. 2d 375, 394 n. 110 (S.D.N.Y. 2003)

---

[12] In its memorandum of law, Hana mistakenly asserts that "[n]o party disputes that the conveyance left New Trend insolvent." (Hana Mem. of Law in Supp. of Summ. J. 15). In fact, the Chang defendants did assert as an affirmative defense that New Trend had not been insolvent during the relevant period (Chang Answer to 1st Am. Intervenor Compl. [docket no. 207-2] ¶ 21), and they reiterate that argument in their opposition to Hana's motion for summary judgment. (Chang Mem. of Law in Opp'n to Summ. J., 20-21).

("Summary judgment ordinarily cannot be defeated merely by a contention that a jury might disbelieve a movant's witnesses. Where, however, there are "specific bases for possible impeachment," credibility questions in appropriate circumstances may result in denial of such a motion.") (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 3D § 2726, at 445-47 (1998)). We therefore agree with the Chang defendants that Hana failed to carry its burden of proof to establish beyond triable dispute that New Trend was insolvent during the relevant period.[13]

In the absence of an adequate showing of insolvency, Hana cannot prevail, by way of summary judgment, on its constructively-fraudulent-conveyance claim. See, e.g., Zanani v.

---

[13] It should be noted that the court's freeze of New Trend's assets does not bear on the question of the company's solvency for purposes of assessing a claim under DCL § 273. This is for two reasons. First, as noted, insolvency in this context refers to the value of a company's assets, not their liquidity. Second, there is a factual question as to whether the inventory was transferred after the freeze order took effect. Under Ms. Chang's version of events, all inventory was transferred to NYCG by November 2010, whereas under Mrs. Louie's version of events, the final set of inventory transfers took place sometime in January 2011. In any event, the freeze order was not issued until the end of January 2011 (Order dated Jan. 21, 2011), so it is not clear whether, even under Mrs. Louie's version of events, any inventory transfers were made after the freeze order took effect.

Meisels, 78 A.D.3d 823, 825, 910 N.Y.S.2d 533, 535 (2d Dep't 2010); Stokes Coal Co. v. Garguilo, 255 A.D. 281, 283, 7 N.Y.S.2d 414, 415 (1st Dep't 1938), aff'd, 280 N.Y. 616, 20 N.E.2d 562 (1939); Promenade Nursing Home v. Cohen-Fleisher, 41 Misc. 3d 1236(A), 2013 WL 6331255 (Table), *3 (Sup. Ct. Kings Cnty. Nov. 1, 2013). Nevertheless, consistent with Rule 56(g), we address each of the other elements that Hana would need to satisfy in order to prevail on this claim.

### ii. Fair Consideration

DCL § 272 defines fair consideration to comprise two elements -- good faith and the payment of a fair equivalent value for the property interest conveyed. See N.Y. Debt. & Cred. Law § 272[14]; Murin, 31 A.D.3d at 1032, 819 N.Y.S.2d at 343; Ede, 193 A.D.2d at 941-42, 598 N.Y.S.2d at 92.

---

[14] Section 202 states:

Fair consideration is given for property, or obligation,

a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

When assessing the fairness of consideration for purposes of a claim of constructively-fraudulent transfer, the court must look to the good faith of both the transferor and the transferee. See, e.g., CIT Grp./Commercial Servs., Inc. v. 160-09 Jamaica Ave. Ltd. P'ship, 25 A.D.3d 301, 303, 808 N.Y.S.2d 187, 190 (1st Dep't 2006); Mega Pers. Lines, Inc., 9 A.D.3d at 555, 780 N.Y.S.2d at 411; Lending Textile, Inc. v. All Purpose Accessories Ltd., 174 Misc. 2d 318, 320, 664 N.Y.S.2d 979, 981 (1st Dep't 1997).[15]

---

N.Y. Debt. & Cred. Law § 202.

[15] Notably, "state and federal courts in New York have differed as to whose good faith matters, with some suggesting that both parties' [transferor's and transferee's] good faith must be established, and others contending that the good faith requirement applies to the transferee alone." In re Sharp Int'l Corp., 302 B.R. 760, 779 (E.D.N.Y. 2003), aff'd, 403 F.3d 43 (2d Cir. 2005) (citing cases). We have been unable to locate any federal citation to state law or any other justifiable legal basis that might explain federal court suggestions that the only relevant state of mind is that of the transferee. See, e.g., In re Allou Distrib., Inc., 404 B.R. 710, 717 (Bankr. E.D.N.Y. 2009); In re Jacobs, 394 B.R. at 660; Lippe, 249 F. Supp. 2d at 377; accord Amusement Indus., Inc. v. Midland Ave. Assocs., LLC, 820 F. Supp. 2d 510, 527 n.7 (S.D.N.Y. 2011) (noting lack of citation to support Second Circuit's assertion in HBE Leasing Corp., 61 F.3d at 1059 n.5, that focus is on good faith of transferee); Sardis v. Frankel, 2014 WL 37870, *5 (1st Dep't Jan. 7, 2014) ("By citing In re Sharp Intl. Corp., 403 F.3d 43, 54 n. 4 (2d Cir. 2005)… for the proposition that, in a constructive fraudulent conveyance action, the requirement to exercise good faith is limited to the transferee, defendants do not accurately portray New York law.").

As the Second Circuit has acknowledged, good faith is a somewhat elusive concept when dealing with claims of constructive fraud, for which the DCL expressly deems intent to be irrelevant. See In re Sharp Int'l Corp., 403 F.3d at 54; United States v. McCombs, 30 F.3d 310, 326 n. 1 (2d Cir. 1994)). There is "some ambiguity as to the precise test" of good faith. HBE Leasing, 48 F.3d at 635-36. In broad terms, good faith "'is lacking where there is a failure to deal honestly, fairly, and openly.'" Sardis, 2014 WL 37870 at *4 (quoting Berner Trucking, Inc. v. Brown, 281 A.D.2d 924, 925, 722 N.Y.S.2d 656 (4th Dep't 2001)); S. Indus., Inc. v. Jeremias, 66 A.D.2d 178, 183, 411 N.Y.S.2d 945, 949 (2d Dep't 1978). Good faith may be deemed to be lacking if there is no "honest belief in the propriety of the activities in question," or if there is "knowledge of the fact that the activities in question will hinder, delay, or defraud others." S. Indus., Inc., 66 A.D.2d at 183, 411 N.Y.S.2d at 949 (citing Sparkman & McLean Co. v. Derber, 4 Wash. App. 341, 342, 481 P.2d 585, 587 (Div. 2 1971)). Transfers to corporate insiders -- that is, controlling shareholders, officers, and directors -- are presumed to be in bad faith. See, e.g., CIT Grp./Commercial Servs., Inc., 25 A.D.3d at 303, 808 N.Y.S.2d at 190; Town of Southampton v. Chiodi, 39 Misc. 3d 1226(A), 971 N.Y.S.2d 75 (Sup. Ct. Suffolk Cnty. 2009), aff'd, 75 A.D.3d 604,

70

907 N.Y.S.2d 25 (2d Dep't 2010). Good faith may also be deemed
to be lacking if the conveyance at issue was made as part of a
series of transactions evidently devised to protect assets from
attachment. See, e.g., Sardis, 2014 WL 37870 at *5. Furthermore,
good faith is, to some extent, measured against the value of
consideration exchanged -- that is, fair consideration, the
second element under DCL § 202. Thus, in general, if the value
paid is a fair equivalent to the value of the property conveyed,
"the statutory requirement of 'good faith' is satisfied if the
transferee acted without either actual or constructive knowledge
of any fraudulent scheme." HBE Leasing Corp., 48 F.3d at 636.

    As for assessing fair value, "§ 272(a), governing a
conveyance made in exchange for the property, provides for the
receipt of something that is 'a fair equivalent therefor,' and §
272(b), governing an antecedent debt or present advance…
provides for an 'amount not disproportionately small as compared
with the value of the property.'" Sardis, 2014 WL 37870 at *3.
Many courts appear to treat these two provisions as comparable
when assessing the value of consideration. See, e.g., HBE
Leasing Corp., 48 F.3d at 638; AIU Ins. Co. v. Robert Plan
Corp., 17 Misc. 3d 1104(A), 851 N.Y.S.2d 56, 2007 WL 2811366,
*12 (Sup. Ct. New York Cnty. 2007); In re Churchill Mortgage

Inv. Corp., 256 B.R. 664, 678 (Bankr. S.D.N.Y. 2000), aff'd sub nom. Balaber-Strauss v. Lawrence, 264 B.R. 303 (S.D.N.Y. 2001).

To show fair equivalent value, "neither 'mathematical precision' nor a 'penny-for-penny exchange' is required." In re Churchill Mortgage Inv. Corp., 256 B.R. at 678 (citing Rubin v. Manufacturers Hanover Trust Co., 661 F.2d 979, 994 (2d Cir. 1981) (discussing fair consideration under 11 U.S.C. § 107(d) (1976))). Rather, the assessment of fair equivalent value requires a court to compare the rough values of what was given and what was received in exchange. See McCombs, 30 F.3d at 326 (issue under DCL § 273 is whether value of mortgage "approached the relative value of the Property"); In re Churchill Mortgage Inv. Corp., 256 B.R. at 679; accord Commodity Futures Trading Comm'n v. Walsh, 17 N.Y.3d 162, 177, 927 N.Y.S.2d 821, 830 (2011). Courts have also tended to recognize an element of reasonableness as inherent in the meaning of fair equivalent value. See, e.g., HBE Leasing Corp., 48 F.3d at 639. The focus of the inquiry into fair equivalent value is on the value of the specific transaction at issue, "i.e., the quid pro quo exchange between the debtor and transferee, rather than an analysis of the transaction's overall value to a debtor as it relates to the welfare of the debtor's business." In re Churchill Mortgage Inv.

Corp., 256 B.R. at 678. Ultimately, "whether fair consideration is given for property under Debtor and Creditor Law § 272 must 'be determined upon the facts and circumstances of each particular case.'" Commodity Futures Trading Comm'n, 17 N.Y.3d at 175, 927 N.Y.S.2d at 828-29 (quoting Halsey v. Winant, 258 N.Y. 512, 523, 180 N.E. 253 (1932)).

In this case, Mrs. Louie has testified that she acted in bad faith and with a fraudulent intent when she conveyed New Trend's inventory to NYCG, and, furthermore, that the conveyances were made for inadequate consideration. However, her testimony is not conclusive on the matter of her state of mind. See, e.g., In re Dana Corp., 574 F.3d at 156; Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (in discrimination context, plaintiff may rebut defendant's explanation of its adverse employment action against the plaintiff). As we have previously indicated, the factfinder could reasonably conclude that Mrs. Louie's testimony as to her state of mind is incredible in view of other evidence, most notably the testimony of Ms. Chang. Viewing the record in the light most favorable to the Chang defendants, we conclude that Mrs. Louie's affidavit testimony fails to establish her state of mind beyond triable dispute. It follows as well that there is a

73

triable issue as to whether Ms. Chang was acting in good faith in her dealings with New Trend.

Nevertheless, we conclude that, as a matter of law, fair consideration was lacking due to the inadequacy of the consideration exchanged. Despite the parties' purported agreement that NYCG would pay the full purchase amount within 120 days of the October 30, 2010 bill of sale (Chang Dep. 90; Chang Decl. dated Feb. 10, 2012 Ex. D), NYCG apparently did not make any payments for the inventory until March 31, 2011 -- that is, after the deadline of February 27, 2011 had passed. (Chang Decl. dated Feb. 10, 2012 at 7). According to Ms. Chang's own testimony, one full year after all of the "purchased" New Trend inventory had been transferred to NYCG, NYCG had only paid, at most,[16] $138,279.60, and it still owed New Trend about $455,534.00. (Id.; Chang Dep. 137).[17] Although Ms. Chang testified that she did not become aware of the Chen litigation against New Trend or of the court-imposed freeze of New Trend's assets until after she had received the New Trend inventory, she admits that she made no payments for that inventory until after

---

[16] Some of the Chang parties' purported payments are disputed by the other parties. (See, e.g., Byunglim Louie Aff. dated Feb. 15, 2012 [docket no. 146] at 7).

[17] The Chang defendants assert that in addition to amounts they paid, they were credited back certain amounts for faulty inventory. (See, e.g., Chang Decl. dated Feb. 10, 2012 at 7).

she had learned of those events (Chang Dep. 30, 33, 104-05),

and, moreover, until after her deadline for payment had passed,

and that her payments amounted to approximately one-third of the

value reflected in the purchase agreement. (See Chang Dep. 137).

Manifestly, then, even assuming that the agreed purchase price

between Ms. Chang and Mrs. Louie amounted to adequate

compensation, the Chang defendants never paid an amount that

could be deemed fair consideration.


In seeking to avoid this result, Ms. Chang advances two

arguments, neither of which saves her position. Thus, she

asserts that NYCG would have paid sooner had Mrs. Louie not

insisted on cash payments. (Chang Decl. dated May 23, 2013 ¶¶

17-18). She does not explain, however, why payments by cash,

rather than check, prevented her and NYCG from making timely or

full payments. In any event, there can be no triable dispute

that a purchaser who has paid or been credited back for only

about thirty-eight percent of the total purchase price, long

after the total has become due, has failed to pay fair

equivalent value for the conveyance. Alternatively, she seeks to

excuse the failure to pay fair consideration by arguing that she

was prevented from doing so by the court's entry of a freeze

order. As we observed in our Report and Recommendation on the

parties' 2012 motion practice, this assertion fails, if for no other reason, because the Chang defendants were contractually required to make full payment for the New Trend inventory that they received in the Fall of 2010 by no later than February 27, 2011, but the freeze order was not entered until ten months later, on December 28, 2011. In short, the freeze order cannot possibly have prevented the Chang defendants from paying fair consideration in accordance with their contract. Thus, their impossibility defense -- even assuming its theoretical viability -- cannot preclude a ruling, as a matter of law, that they failed to pay fair consideration.

In view of the foregoing, even if the factfinder were to determine that the Chang defendants had acted in good faith, fair consideration would still be lacking due to the fact that they did not pay a fair equivalent value for the inventory.[18]

---

[18] As an aside, we also note that there is a factual dispute as to whether Ms. Chang qualified as a corporate insider at New Trend and, thus, whether New Trend's conveyance to her company may be deemed per se to have been made in bad faith. (See, e.g., Chang Dep. 28, 49-50; Hana 56.1 Statement in Supp. of Summ. J. ¶ 9; cf. Chang Decl. in Opp'n to Hana OSC [docket no. 140] ¶¶ 8-9). Of course, if the trier of fact were to conclude that Ms. Chang had been the Chief Financial Officer of New Trend, or had otherwise served as a controlling shareholder, director, or officer of the company, New York law would presume the conveyance of inventory by New Trend to NYCG to have been made in bad faith, and fair consideration would necessarily be lacking on that basis.

Accordingly, we recommend, pursuant to Rule 56(g), that the court hold that it is beyond triable dispute that fair consideration was lacking in exchange for New Trend's conveyance of inventory to NYCG.

### iii. The Chang Defendants' Innocent-Purchaser-for-Value Defense

For reasons similar to those discussed concerning the issue of fair consideration, we find, as a matter of law, that the Chang defendants are unable to establish that they qualify as innocent purchasers for value.

Pursuant to DCL § 278, even if a fraudulent conveyance is established, a creditor may not set aside the conveyance if it was made to a good-faith purchaser for fair value who lacked knowledge -- actual or constructive -- of the fraud at the time of the conveyance. See N.Y. Debt. & Cred. Law § 278(1); Sardis, 2014 WL 37870 at *5; In re Jacobs, 394 B.R. at 659; HBE Leasing Corp., 48 F.3d at 636; United States v. Dreier, 2013 WL 3306219, *8 (S.D.N.Y. July 2, 2013); Chemtex, LLC v. St. Anthony Enter., Inc., 490 F. Supp. 2d 536, 544 (S.D.N.Y. 2007). "[U]nder section 278, the focus is on the good faith of the transferee" only. FDIC v. Malin, 802 F.2d 12, 19 (2d Cir. 1986). Importantly,

innocent-purchaser-for-value status under DCL § 278 is an affirmative defense. See In re Bernard L. Madoff Inv. Sec. LLC, 454 B.R. 317, 341 (Bankr. S.D.N.Y. 2011); In re Bernard L. Madoff Inv. Sec. LLC, 458 B.R. 87, 106 n.10 (Bankr. S.D.N.Y. 2011).

In this case, we note that the Chang parties, in their answer to Hana's Amended Intervenor Complaint, did assert as an affirmative defense that they paid fair consideration for the inventory purchased from New Trend (Chang Answer to 1st Am. Intervenor Compl. [docket no. 207-2] ¶¶ 13-14), but did not assert that they acted in good faith. Their failure to do so is a sufficient basis for deeming their affirmative defense of innocent-purchaser-for-value status to be waived. See, e.g., U.S. For & On Behalf of Mar. Admin. v. Cont'l Ill. Nat. Bank & Trust Co. of Chicago, 889 F.2d 1248, 1254 (2d Cir. 1989); FDIC v. Drysdale, 2013 WL 5965723, *5 n.2 (E.D.N.Y. Nov. 7, 2013).

In any event, even if the affirmative defense had not been waived, as previously discussed (see supra 68-77), we conclude that the Chang defendants failed to carry their affirmative burden of proof to demonstrate a triable dispute as to whether they paid fair consideration.

78

For these reasons, we recommend, pursuant to Rule 56(g), that the court deem it to be beyond triable dispute that the Chang defendants do not qualify as innocent purchasers for value.

### 5. Hana's Conversion Claim

Hana also asserts that the Chang parties' acquisition of the New Trend inventory amounted to conversion, in that it deprived Hana of its immediate rights to own and possess the collateral as of the time of the New Trend parties' default. (See Hana Mem. of Law in Supp. of Summ. J., 11; 1st Am. Intervenor Compl., 14).

"'According to New York law, "[c]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights."'" Thyroff v. Nationwide Mut. Ins. Co., 360 F. App'x 179, 180 (2d Cir. 2010) (quoting Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 403-04 (2d Cir. 2006)). Thus, to prove a claim of conversion, "'the plaintiff must show legal ownership or an immediate superior right of possession to a specific identifiable thing and must show that the defendant exercised an

unauthorized dominion over the thing in question... to the exclusion of the plaintiff's rights.'" Schulz v. Dattero, 104 A.D.3d 831, 833, 961 N.Y.S.2d 308, 312 (2d Dep't 2013) (quoting Scott v. Fields, 85 A.D.3d 756, 757, 925 N.Y.S.2d 135, 137 (2d Dep't 2011)). If a defendant acquired the disputed property lawfully, it is an essential element of the conversion claim that the plaintiff have first demanded the return of the property and been rebuffed by the defendant. Id.; In re Coyle, 21 Misc. 3d 742, 745, 864 N.Y.S.2d 765, 768 (Sur. 2008). In contrast, there is no requirement for demand and refusal if the defendant did not acquire the property through lawful means. See Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc., 87 F.3d 44, 49 (2d Cir. 1996). Similarly, such a demand is not required if, in the interim, the recipient of the property has transferred or destroyed it, see, e.g., MacDonnell v. Buffalo Loan, Trust & Safe Deposit Co., 193 N.Y. 92, 101, 85 N.E. 801, 803 (1908); In re Vogel, 23 Misc.3d 512, 516-17, 871 N.Y.S.2d 894, 898-99 (Sur. Ct. Westchester Cnty. 2009) (citing cases), or if making the demand would otherwise be futile. See State of New York v. Seventh Regiment Fund, Inc., 98 N.Y.2d 249, 261, 746 N.Y.S.2d 637, 646 (2002).[19] Finally, although in some

---

[19] Futility has been employed by the New York courts as an exception to legal requirement of a prior demand in various circumstances, including contract claims, see, e.g., Arrowhead

circumstances a plaintiff may not satisfy the requirement of demand and refusal by filing a lawsuit accusing the defendant of conversion, see, e.g., Salatino v. Salatino, 64 A.D.3d 923, 881 N.Y.S.2d 721, 723 (3d Dep't 2009); Apex Ribbon Co. v. Knitwear Supplies, Inc., 22 A.D.2d 766, 767, 253 N.Y.S.2d 643, 644 (1st Dep't 1964), that may not be the case if the possessor of the property, although he may have acquired it lawfully, is aware of the plaintiff's claimed security interest in the goods purchased. See, e.g., Banco Central de Paraguay v. Paraguay Humanitarian Found., 2005 WL 53271, *6 (S.D.N.Y. Jan. 7, 2005); Schanbarger v. Edward Dott's Garage, Inc., 61 A.D.2d 243, 245-46, 402 N.Y.S.2d 72, 74 (3d Dep't 1978); see also Standard Dying & Finishing Co. v. Arma Textile Printers Corp., 1991 WL 49782, *10 (S.D.N.Y. March 25, 1991); Chemical Bank v. Society Brand Indus., Inc., 624 F. Supp. 979, 982 (S.D.N.Y. 1985).[20]

---

Cap. Fin., Ltd. V. Seven Arts Pictures PLC, 36 Misc.3d 1205(A), 2012 WL 2478306, *8 (Sup. Ct. N.Y. Cnty. June 20, 2012), and in derivative actions. See, e.g., Hecht v. Andover Assocs. Mgmt. Corp., __ A.D.3d __, 979 N.Y.S.2d 650, 652 (2d Dep't 2014) (citing cases).

[20] We note that the prior-demand requirement in New York law reflects a minority position among the states. See Restatement (Second) Torts § 229 cmt. h (1965).

The general rule in New York is that "a security interest…
continues in collateral notwithstanding sale, lease, license,
exchange, or other disposition thereof unless the secured party
authorized the disposition free of the security interest…" N.Y.
U.C.C. § 9-315(a)(1). As an exception to this rule, "a buyer in
[the] ordinary course of business… takes free of a security
interest created by the buyer's seller, even if the security
interest is perfected and the buyer knows of its existence." Id.
§ 9-320(a). In other words, it generally is not a defense to a
claim of conversion that the defendant purchased the disputed
goods in good faith, unless the defendant also qualifies as a
"buyer in the ordinary course." See, e.g., Newbro v. Freed, 409
F. Supp. 2d 386, 397 (S.D.N.Y. 2006), aff'd, 2007 WL 642941 (2d
Cir. Feb. 27, 2007); Joseph P. Carroll Ltd. v. Baker, 889 F.
Supp. 2d 593, 606 (S.D.N.Y. 2012); Nissan Motor Acceptance Corp.
v. Scialpi, 94 A.D.3d 1067, 1068, 944 N.Y.S.2d 160, 162 (2d
Dep't 2012); Ruffalo v. Coffaro, 1989 WL 83397, *3 (E.D.N.Y.
July 11, 1989), aff'd, 89 F.2d 137 (2d Cir. 1990); Five O'clock
Club, Inc. v. Savino, 36 Misc. 3d 1220(A), 959 N.Y.S.2d 88 (Sup.
Ct. New York Cnty. 2012) (defendant's "statement that she was
unaware of… fraudulent scheme, is insufficient to raise a
triable issue of fact as to her liability for conversion as a

cause of action for conversion does not require a tortious taking or a showing that a defendant acted in bad faith").

New York's Uniform Commercial Code ("UCC") defines a "buyer in the ordinary course" as:

> a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person, other than a pawnbroker, in the business of selling goods of that kind. A person buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices.

N.Y. U.C.C. Law § 1-201(9). Generally, good faith in the context of the U.C.C. refers to "honesty in fact in the conduct or transaction concerned," id. at § 1-201(19), but in the case of a merchant[21] it refers to "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." Id. at § 2-103(1)(b).

In their memorandum of law opposing Hana's motion, the Chang defendants assert that they qualify as buyers in the

---

[21] A merchant is "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill." N.Y. U.C.C. § 2-104(1).

ordinary course. (See Chang Mem. of Law in Opp'n to Summ. J.,
11-12). A defendant's status as a buyer in the ordinary course
is an affirmative defense, see Hann Fin. Serv. Corp. v. Republic
Auto Credit Grp., LLC, 18 A.D.3d 434, 435, 794 N.Y.S.2d 423, 424
(2d Dep't 2005), and pursuant to Rule 8(c) the defendant must
plead it or else be barred from invoking it at later stages of
the litigation. Design Options, Inc. v. BellePointe, Inc., 940
F. Supp. 86, 91 (S.D.N.Y. 1996) (quoting Doubleday & Company,
Inc. v. Curtis, 763 F.2d 495, 503 (2d Cir. 1985)). In their
March 23, 2012 answer to Hana's amended intervenor complaint,
the Chang defendants asserted nineteen affirmative defenses, but
did not plead that they qualified as buyers in the ordinary
course. (Chang Answer to 1st Am. Intervenor Compl. [docket no.
207-2]). Moreover, they have not moved to amend their answer to
add such an affirmative defense. As such, that defense should be
deemed waived. See, e.g., U.S. For & On Behalf of Mar. Admin.,
889 F.2d at 1254; FDIC, 2013 WL 5965723 at *5 n.2.

In any event, the Chang defendants have failed to carry
their burden of proof in defining a triable issue as to whether
they qualify as buyers in the ordinary course. Both NYCG and
Nina Chang are "merchants," as they are persons who regularly
deal in the women's garment business and hold themselves out as

possessing knowledge peculiar to that business. See N.Y. U.C.C. § 2-104(1); (see, e.g., Chang Dep. pp. 129-30, 152-53; Hana 56.1 Statement in Supp. of Summ. J. ¶2). As such, to qualify as buyers in the ordinary course, the Chang defendants would need to establish (i) that they had acted in good faith, meaning with "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade," id. at § 2-103(1)(b), (ii) that they had acted without knowledge that the sale violated the rights of another person in the goods, and (iii) that the sale was made in the ordinary course by a person in the business of selling goods of that kind.

New York courts have specifically held that sales that do not qualify for protection under UCC § 1-201(9) include "bulk sale[s], [] sale[s] in distress at an obvious loss price, [and] [] sale[s] in liquidation." Tanbro Fabrics Corp. v. Deering Milliken, Inc., 39 N.Y.2d 632, 637, 350 N.E.2d 590, 592 (1976); Sindone v. Farber, 105 Misc. 2d 634, 639, 432 N.Y.S.2d 778, 782 (Sup. Ct. Nassau Cnty. 1980). Thus, New Trend's liquidation sale at prices that Ms. Chang acknowledged to be "closeout" prices (Chang Decl. dated Feb. 10, 2012 at 7) presumably would not qualify as a transaction in the ordinary course of business. In addition, as Ms. Chang herself indicates, she and her financial

advisors viewed New Trend's purported desire to be paid exclusively in cash, for large sums, as an apparent red flag that something was amiss. (See Chang Decl. dated May 23, 2013 ¶ 17). As such, the Chang defendants were obliged to investigate further into the ownership interests of the merchandise they were purchasing. See, e.g., Kozar v. Christie's, Inc., 31 Misc. 3d 1228(A), 929 N.Y.S.2d 200 (Table), 2011 WL 1886585, *9 (Sup. Ct. Westchester Cnty. 2011); Anchev v. 335 W. 38th St. Co-op. Corp., 29 Misc. 3d 1223(A), 920 N.Y.S.2d 239, 2010 WL 4628030, *6 (Sup. Ct. New York Cnty. 2010). Their failure to do so in light of the circumstances provides yet another basis for denying their buyer-in-the-ordinary-course defense.

There is no material dispute (i) that Hana held a perfected, first priority security interest in New Trend's inventory, (ii) that upon the New Trend parties' default on February 5, 2010, Hana acquired an immediate right to the collateral, superior to the rights of the other parties (see Lee Decl. dated Apr. 15, 2013, Exs. B & E),[22] and (iii) that the Chang parties' possession of the collateral -- for which they paid New Trend only a small portion of its contractually

_____

[22] We address Hana's rights vis-à-vis the Chen plaintiffs below. (See infra 94-95).

stipulated value -- has interfered with Hana's ability to exercise its rights in the collateral. The only remaining question on the conversion claim is whether the absence of evidence of a demand by Hana for surrender of the property precludes summary judgment on the claim. As we have noted, a demand is ordinarily required if the defendants acquired the collateral lawfully but not if they have disposed of it or if a demand would have been demonstrably futile. Because Hana never directly addresses these issues, we find that there are still triable issues of fact pertaining to whether a demand was required and not made.

The "lawfulness" of an acquisition refers generally to the fairness of a transaction and the absence of "wrongfulness." Regions Bank v. Wieder & Mastroianni, P.C., 526 F. Supp. 2d 411, 415 (S.D.N.Y. 2007), aff'd, 268 F. App'x 17 (2d Cir. 2008). For example, possession may be lawful if it was initially undertaken with the consent of the property owner, see MacDonnell, 193 N.Y. at 101, 85 N.E. at 803; Salatino v. Salatino, 64 A.D.3d 923, 881 N.Y.S.2d 721, 723 (3d Dep't 2009); Shea v. Chinn, 223 A.D. 476, 477, 229 N.Y.S. 24, 25 (3d Dep't), aff'd, 249 N.Y. 617, 164 N.E. 606 (1928), or if the purchaser was "innocent" -- a term that we assume approximates good faith. See Leveraged Leasing Admin.

87

_Corp. v. PacifiCorp Capital, Inc._, 87 F.3d 44, 49 (2d Cir. 1996); _Lawrence v. Meloni_, 163 A.D.2d 827, 828, 558 N.Y.S.2d 360, 361 (4th Dep't 1990). It appears that "lawfulness" also incorporates an element of awareness that one's conduct will interfere with the rights of another. See, e.g., _MacDonnell_, 193 N.Y. at 102, 85 N.E. at 803-04 ("Having once lawfully acquired the physical custody of the bonds, the defendant could not be guilty of a conversion of them until it did something to indicate that it proposed to ignore the owner's rights, and assert its own claim in [h]ostility thereto."); _Mendelson v. Boettger_, 257 A.D. 167, 170, 12 N.Y.S.2d 671, 674 (2d Dep't), _aff'd_, 281 N.Y. 747, 23 N.E.2d 554 (1939) ("Every unauthorized taking of personal property, and all intermeddling with it, beyond the extent of the authority conferred, in case a limited authority has been given, _with_ _intent_ so to apply and dispose of it as to alter its condition or interfere with the owner's dominion, is a conversion.") (emphasis added). Thus, a transfer will generally be deemed unlawful "where the transferor knew the transfer would violate the superior property rights of another, yet disposed of the property anyway, usually for personal gain." _Id._; see, e.g., _MacDonnell_, 193 N.Y. at 102, 85 N.E. at 804. It is the burden of the purchaser to establish that the property was lawfully acquired. See _Solomon R. Guggenheim Found. v._

88

Lubell, 153 A.D.2d 143, 146-47, 550 N.Y.S.2d 618, 620 (1st Dep't 1990), aff'd, 77 N.Y.2d 311, 567 N.Y.S.2d 623 (1991).

As we have noted, the nature of the transactions between New Trend and NYCG remains a matter of extensive factual dispute, due to the conflicting renditions of events offered by Mrs. Louie and Ms. Chang. If the factfinder were to credit Ms. Chang's version of events, it could reasonably conclude that, at the time of the transfer, she had contracted in good faith to purchase New Trend's inventory, that she had been unaware that her purchase would impede Hana's claims to New Trend inventory, and that it was not otherwise "wrongful." Because Ms. Chang's subjective good faith remains an issue of triable dispute, there is, by extension, an open question as to whether the Chang defendants' acquisition of the New Trend inventory was initially "lawful."

The other potential exceptions to the demand requirement are also possibly subject to triable dispute. It is unclear whether the Chang defendants disposed of some or all of the inventory after its initial acquisition, or whether they were on notice of Hana's adverse claim to them. Hana, having failed to address the demand requirement, offers no argument for the

notion that a demand would have been futile. Although such a showing might be viable -- we note that one example is if the alleged converter is "a thief," see, e.g., Seventh Regiment Fund, 98 N.Y.2d at 261, 746 N.Y.S.2d at 646, and Hana might show that the Chang defendants' failure to pay New Trend the contract price amounted to such theft -- it is Hana's Rule 56 burden to address the issue and it has not done so.[23]

In sum, Hana has not asserted that it made a demand upon the Chang defendants for the return of the collateral (see generally Hana 56.1 Statement in Supp. of Summ. J.), presumably because of its asserted belief that the Chang defendants acquired the inventory unlawfully. Given that demand-and-refusal may be an essential element to Hana's conversion claim and that no evidence of such a demand or of the applicability of a recognized exception has been put forward, summary judgment on that claim should be denied. See Thyroff, 360 F. App'x at 181; Apex Ribbon Co., 22 A.D.2d at 767, 253 N.Y.S.2d at 644 (1964) ("The moving papers herein contain no factual statements showing

---

[23] We note also that the parties have not addressed whether the transfer to the Chang defendants raised any issues regarding compliance with Article 6 of the Uniform Commercial Code. See generally Cleaners Products Supply, Inc. v. Garcia, 165 Misc. 2d 365, 367-69, 629 N.Y.S.2d 647, 649-51 (Civ. Ct. Bronx Cnty. 1995).

a demand for the return of the goods and refusal to comply therewith. There is only a repetition of the conclusory allegation set forth in the complaint. Such defect prevents the granting of summary judgment.").

### 6. Hana's Replevin Claim

To succeed in a replevin action to recover chattel, "the plaintiff need only establish a superior possessory right in the chattel to that of the defendant." G & S Quality Inc. v. Bank of China, 233 A.D.2d 215, 216, 650 N.Y.S.2d 97, 98 (1st Dep't 1996), overruled on other grounds by Jamie v. Jamie, 19 A.D.3d 330, 798 N.Y.S.2d 36 (1st Dep't 2005); see also Int'l Bus. Machines Corp. v. BGC Partners, Inc., 2013 WL 1775367, *9 (S.D.N.Y. Apr. 25, 2013) ("To establish a claim for replevin, the plaintiff must prove two elements: (1) that plaintiff has a possessory right superior to that of the defendant; and (2) that plaintiff is entitled to the immediate possession of that property.") (quoting Jamison Bus. Sys., Inc. v. Unique Software Support Corp., 2005 WL 1262095, *14 (E.D.N.Y. May 26, 2005)); Batsidis v. Batsidis, 9 A.D.3d 342, 343, 778 N.Y.S.2d 913, 913 (2d Dep't 2004); Pivar v. Graduate Sch. of Figurative Art of the

N.Y. Acad. of Art, 290 A.D.2d 212, 213, 735 N.Y.S.2d 522, 524 (1st Dep't 2002).

As with conversion, when the property to be recovered is in the custody of a defendant who has acquired the property legally, it is an essential element of the plaintiff's claim that a "demand for return of the property has first been made and refused, this because a good-faith purchaser of stolen property commits no wrong, as a matter of substantive law, until he has first been advised of the plaintiff's claim to possession and given an opportunity to return the chattel." See Solomon R. Guggenheim Found., 153 A.D.2d at 146-47, 550 N.Y.S.2d at 620 (citations omitted); Bakalar v. Vavra, 619 F.3d 136, 141 (2d Cir. 2010). The burden of establishing that the chattel was not stolen rests with the purchaser-defendant. Solomon R. Guggenheim Found., 77 N.Y.2d at 321, 567 N.Y.S.2d at 628.

Notably, New York allows a claim of replevin to lie even if the defendant is no longer in possession of the property in question and, moreover, even if the defendant initially acquired the property in good faith and for valuable consideration. See Cutten V. Kostyrka, 203 Misc. 940, 940-41, 118 N.Y.S.2d 194, 195 (Sup. Ct. New York Cnty. 1952); Ross v. Cassidy, 27 How. Pr.

416, 416 (Sup. Ct. Gen. Term 1864) ("A purchaser of personal property, though in good faith and for a valuable consideration, obtains no title from a person who wrongfully took the same from the owner. He is bound to deliver the property to the owner on demand, if it be still under his control, or to account to him for its value, if he have parted with it").

As with Hana's conversion claim, the Chang defendants appear to argue that replevin is unwarranted because they were buyers in the ordinary course. (See Chang Mem. of Law in Opp'n to Summ. J. Mot., 13-16). However, as we have previously noted, this defense was waived and is, in any event, untenable on the record before us. (See supra 83-86).

Although there is no material dispute that Hana holds a first-priority perfected security interest in the transferred New Trend inventory (See Hana Mem. of Law in Supp. of Summ. J., 11; 1st Am. Intervenor Compl., 13), there is an open question as to whether the Chang defendants acquired the inventory "lawfully" and, if so, whether Hana is nonetheless excused from demonstrating demand-and-refusal as an essential element of its replevin claim against them. We therefore conclude that summary judgment on that claim should be denied.

93

### 7. Hana's Claim for Declaratory Relief and Partial Judgment

In its first claim, Hana seeks a declaration "(1) finding that no party has a superior interest to Hana in the Collateral; (2) finding that Hana is entitled to immediate possession of the Collateral held by New Trend and the Chang Parties; (3) ordering the New Trend Parties and Chang Parties to turn[ ]over the Collateral to Hana; and (4) permitting immediate possession of the cash collateral account as well as monies held in escrow from the sale of Inventory." (Hana Summ. J. Mem. at 3-4; 1st Am. Intervenor Compl. [docket no. 212-8] 10).

We conclude that, of these issues, Hana has established the first beyond triable dispute. In other words, there is no triable dispute that Hana holds a secured, first-priority interest in New Trend's collateral, superior to that of all other parties in this case. The New Trend parties have stipulated their agreement with each claim set forth in Hana's complaint and have consented to the relief that Hana is seeking. (See Lee Decl. dated Apr. 15, 2013 at Ex. G ¶ 5). In addition, the Chang defendants have failed to raise a triable dispute over the fact that they acquired New Trend's inventory subject to Hana's security interest. As for the Chen parties, while there

94

is a factual dispute as to whether they qualify as creditors and
thus may hold some interest in New Trend's assets (see infra
105-07), they have failed to put forward any evidence
demonstrating that any interest that they may have had in New
Trend's inventory was secured. As a result, they have failed to
raise a triable dispute over the seniority of Hana's interest
relative to their own. See N.Y. U.C.C. Law § 9-310(a) (McKinney)
(generally "a financing statement must be filed to perfect all
security interests"); Resner v. Greeley, 212 A.D.2d 619, 622
N.Y.S.2d 330, 331 (2d Dep't 1995) (where a creditor had filed a
UCC-1 filing statement prior to a judgment creditor having
perfected it lien, the first creditor held the superior claim).


        As for the other issues on which Hana seeks declaratory
relief and partial judgment, we conclude that it has failed to
establish that it is entitled to such relief at the summary-
judgment stage. If and when it demonstrates the amount that is
currently owed by the New Trend defendants on the JMC loan and
guarantees -- including principal and accrued interest -- it
will be entitled to access the escrowed funds representing
proceeds from the sale of the New Trend inventory to the extent
necessary to satisfy that debt. If that sum is insufficient to
fully compensate Hana, it may have a claim on inventory and/or

                                95

cash possessed by the Chang defendants and now subject to the freeze order entered pursuant to the December 2011 stipulation; but, for reasons already noted, the final disposition of Hana's claims for fraudulent conveyance, conversion, and replevin as against the Chang defendants must await resolution of current factual disputes.

In sum, we recommend that the court deny summary judgment on Hana's first claim. Nevertheless, we recommend, pursuant with Rule 56(g), that the court deem it established beyond triable dispute that Hana holds a first-priority, secured interest in New Trend's inventory that is senior to that of any other party in this case.

## III. The Chen Plaintiffs' Motion

The Chen plaintiffs have moved for summary judgment against the New Trend defendants on their claims for breach of contract, unjust enrichment, and fraudulent conveyance. (Chen Summ. J. Mem. of Law, 3-7). They have also moved for summary judgment against the Chang defendants on their unjust-enrichment, fraudulent-conveyance, and conversion claims. (Id.). In

96

addition, they seek to recover attorneys' fees on their
fraudulent-conveyance claim.

The other parties oppose the motion.

## Analysis of the Motion

The Chen parties argue that the New Trend defendants
breached their contract with Sunning Eagle by failing to pay
$815,802.64 purportedly owed for goods. (Chen Summ. J. Mem. of
Law 4). They also assert that the New Trend defendants breached
the parties' agreement by failing to register the Paris Angel
and Miss Juli marks and by failing to invest $1 million in New
Trend. As an alternative to breach of contract, the Chen parties
assert that they are entitled to summary judgment for unjust
enrichment. (Id. at 4-5). The Chen plaintiffs also echo Hana's
fraudulent-conveyance and conversion claims, arguing that
because New Trend purportedly owed them money, New Trend's
conveyance of inventory to NYCG interfered with their possessory
interest in New Trend's assets, since they are creditors of the
company. (Id. at 6-7).

97

In their opposition, the Chang parties argue that the Chen plaintiffs failed to comply with Local Rule 56.1 by failing to cite to evidence for each statement of fact asserted in their 56.1 Statement. (Chang Decl. dated May 23, 2013 at 18). They also assert that the motion is defective because the notice of motion and 56.1 statement do not name them. (Chang Mem. of Law in Opp'n to Summ. J., 22-23). Hana and the New Trend defendants agree in opposing the Chen parties' assertion that New Trend owes them money for shipments of clothing, and in doing so Hana and New Trend point to evidence of payments and offsets not accounted for in the Chen parties' calculations. (See Hana 56.1 Opp'n to Chen Mot. ¶ 9; New Trend 56.1 Opp'n to Chen Mot. Response 9). Hana and New Trend also dispute that there was a binding agreement between New Trend and the Chen parties concerning trademark registration and, in any event, they assert that there was no injury resulting from a failure to register the marks at issue. (Sheppeard Decl. dated May 24, 2014 at 2; New Trend Mem. of Law in Opp'n to Chen Mot. 4-5). The New Trend parties further dispute that there was ever an agreement by Mr. Louie to invest $1 million in New Trend, and they argue that the Chen parties have failed to put forward admissible evidence of any such agreement, particularly taking into account a merger clause that they argue governs the parties' written agreement.

(New Trend Mem. of Law in Opp'n to Chen Mot. 6-7). Lastly, Hana
argues -- as do the Chang defendants -- that "to the extent that
the Chen Parties rely on any declarations or affidavits
interposed by Mr. Lifeng Chen, such documents should be
disregarded by the Court and struck" because "Mr. Chen cannot
speak or read any English." (Sheppeard Decl. dated May 24, 2014
at 2; Chang Mem. of Law in Opp'n to Summ. J. 23).

We begin our assessment of the Chen parties' motion with
two preliminary issues -- first, the Chen plaintiffs' failure to
fully comply with Local Rule 56.1 and, second, the Chang
defendants' assertion that the Chen parties did not properly
move against them. We next turn to Hana's over-arching attack on
the validity of the English-language documents signed by Mr.
Chen and submitted in support of the Chen plaintiffs' motion.
Finally, we turn our discussion to an assessment of the merits
of the Chen plaintiffs' claims for breach of contract, unjust
enrichment, fraudulent conveyance, and conversion, each in turn.

## 1. The Chen Parties' Failure to Fully Comply with Local Rule 56.1

In contravention of Local Civil Rule 56.1(d), several of
the statements set forth in the Chen parties' Rule 56.1

statement do not contain a citation to evidence. (See Chen 56.1 Statement in Supp. of Summ. J. ¶¶ 3-5, 7, 9-12, 14-15). That omission provides sufficient basis for denying summary judgment on any of the Chen parties' claims that are premised on the unsupported assertions of fact. See Fernandez v. DeLeno, 71 F. Supp. 2d 224, 227 (S.D.N.Y. 1999). In any event, we have conducted an "assiduous review of the record," Monahan, 214 F.3d at 292, and, as we discuss below, we conclude that there is no substantive merit to the plaintiffs' motion.

## 2. The Chen Parties' Purported Failure to Name the Chang Defendants in Their Notice of Motion and Rule 56.1 Statement

The Chang defendants assert that the Chen parties have not effectively moved against them because, among other things, they did not name the Chang defendants in their notice of motion and purportedly did not assert any facts about the Chang defendants in their Rule 56.1 Statement. (Chang Mem. of Law in Opp'n to Summ. J., 22-23). Neither of these arguments is availing.

On the first point, the Chang parties have not cited any legal authority to support their argument, nor have we been able to identify such authority through independent research. There is no requirement in Rule 7 or Local Rule 7.1 that a notice of

motion individually name the parties against whom judgment will be sought, although Rule 7 does require that the notice set forth "the relief sought." See Fed. R. Civ. Pro. 7(b)(1); S.D.N.Y. Local R. 7.1(a)(1). Here, we conclude that the Chen plaintiffs' notice of motion substantially complied with these requirements in stating that the Chen plaintiffs would "move for summary judgment in the above-captioned action pursuant to Rule 56 of the Federal Rules of Civil Procedure." (Chen Notice of Mot. for Partial Summ. J. [docket no. 278]). Moreover, as the Chang defendants have undisputedly been served with, reviewed, and responded to the motion, we do not believe that any prejudice will result from deeming the motion to be targeting them.

As for the Chang defendants' assertion that they are not mentioned at all in the Chen parties' Rule 56.1 Statement, that simply is not correct. (See Chen 56.1 Statement in Supp. of Summ. J., ¶13). Moreover, the asserted lack of evidentiary support for the Chen parties' claims against the Chang defendants goes to the weight of those claims, not the preliminary issue of whether the Chen plaintiffs have moved for summary judgment against the Chang defendants.

**3. The Validity of English-Language Documents Signed by Lifeng Chen**

Hana and the Chang parties argue that any English-language documentary evidence in this case signed by Mr. Chen, including his declarations and affidavits, should be deemed void because those documents were not translated into English, and Mr. Chen testified in his deposition that he does not read English. (See Chang Mem. of Law in Opp'n to Summ. J., 23; Hana 56.1 Opp'n to Chen Mot., ¶¶ 1-4, 10-11; Sheppeard Decl. dated May 24, 2013, ¶ 2). They thereby seek to preclude the admission of the documentary evidence submitted in support of the Chen plaintiff's motion.

While it is undisputed that Mr. Chen does not speak or read English (see, e.g., Chen Dep. pp. 9, 91, 115), he testified that "for all the signature I've signed, there would be a Chinese translation provided" (id. at 115, 165), noting "I typically only sign after I have the translator to translate everything so I know what I'm signing." (Id. at 170-71). Moreover, the record contains no admission by him that he failed to follow that practice when signing the documents that are currently in issue.

102

Under New York law, a person's inability to understand English generally is not a defense to the validity of an English-language legal instrument signed by that individual. See Maines Paper & Food Serv. Inc. v. Adel, 256 A.D.2d 760, 761, 681 N.Y.S.2d 390, 391 (3d Dep't 1998) ("difficulty" with English did not excuse failure to have terms of contract explained before signing); Advanta Bus. Servs. Corp. v. Colon, 4 Misc. 3d 117, 119, 782 N.Y.S.2d 502, 504 (Sup. Ct. New York Cnty. 2004). Moreover, there is a legal presumption that a person who does not understand English will have the contents of an English-language document translated for him prior to signing. See Advanta Bus. Servs. Corp., 4 Misc. 3d at 119, 782 N.Y.S.2d at 504. Indeed, Mr. Chen testified at his deposition that he did so prior to signing the documents.

We note that during Chen's deposition he professed not to recognize the disputed documents that opposing counsel presented to him for visual inspection. (See, e.g., Chen Dep. 9 ("Q. Have you ever seen this paper, either a Xerox copy or a form copy? A. I don't understand English. How could I remember if -- if I've seen this?")). However, it does not appear that opposing counsel ever questioned Chen about the underlying substance of the disputed documents, whether Mr. Chen had understood the terms or

whether, in fact, he had signed the documents, and we do not find it at all damning to the validity of a document that a signatory might fail to remember its physical appearance. Because the opposing parties have failed to point to any evidence that might draw into question the substantive validity of the disputed documents or contradict Chen's assertion that he had the documents translated prior to signing, we conclude that the challenge to those documents based on Chen's inability to understand English must fail.[24]

## 4. The Chen Parties' Breach-of-Contract Claims Against New Trend

The Chen parties have asserted that they are entitled to summary judgment on three breach-of-contract claims: (1) that the New Trend parties failed to pay amounts owing for merchandise shipped by the Chen plaintiffs; (2) that the New Trend parties failed to register two trademarks; and (3) that Kisum Louie failed to invest $1 million dollars in New Trend. It is well established that in New York "the elements of a breach of contract cause of action are 'the existence of a contract,

---

[24] Hana and other parties opposing the Chen plaintiffs' summary judgment motion will of course be free to use the cited testimony of Mr. Chen for impeachment purposes at trial.

the plaintiff's performance under the contract, the defendant's breach of that contract, and resulting damages.'" <u>Niagara Foods, Inc. v. Ferguson Elec. Serv. Co., Inc.</u>, 2013 WL 6038070, *2 (4th Dep't Nov. 15, 2013) (quoting <u>JP Morgan Chase v. J.H. Elec. of N.Y., Inc.</u>, 69 A.D.3d 802, 803, 893 N.Y.S.2d 237 (2d Dep't 2010)).

Notwithstanding Hana's meritless objection to the validity of the Chen-New Trend agreements on the basis of Mr. Chen's lack of familiarity with the English language (<u>see</u> Hana 56.1 Opp'n to Chen Mot., ¶¶ 1-2; <u>supra</u> 101-04), there is no material dispute over the formation of a contract between Chen and New Trend pursuant to the written terms of the Letter of Intent and the Supplementary Agreement to the Letter of Intent. (<u>See</u> New Trend and Chang 56.1 Opp'n Statements to Chen Mot. at Resp. nos. 1 & 2). For this reason, the only questions before us are the scope of the parties' agreement and whether any breach occurred.

### a. Amounts Unpaid

The Chen parties argue that they are owed $815,802.64 for inventory purchased by New Trend. (<u>See</u> Chen 56.1 Statement in Supp. of Summ. J., ¶ 9). They fail, however, to demonstrate a

factual basis for this assertion, much less show that they are entitled to prevail as a matter of law.

It is undisputed that the Chen plaintiffs shipped merchandise to New Trend valued at $2,072,184.76.00. (See Cai Decl. dated Apr. 12, 2013 [docket no. 280], ¶ 3 & Ex. E; see also New Trend, Hana, and Chang 56.1 Opp'n Statements at Resp. no. 6). There also is no dispute that New Trend paid $1,256,382.12 to plaintiffs over the course of 2009 and 2010. (See New Trend, Hana, and Chang 56.1 Opp'n Statements at Resp. no. 8; Cai Decl. dated Apr. 12, 2013, ¶ 9 & Ex. E). The Chen plaintiffs argue that New Trend failed to pay the remaining difference, thus breaching its contractual obligation. However, the New Trend parties and Hana note in their respective oppositions that the Chen plaintiffs' accounting of purported amounts owed improperly fails to take account of an undisputed $1 million payment made by New Trend to the Chen parties on March 3, 2009, "as advanced payments for the orders placed by [New Trend]." (See New Trend and Hana 56.1 Opp'n Statements to Chen Mot. at Resp. no. 9; see also Chen 56.1 Statement in Supp. of Summ. J., ¶ 5). The New Trend parties and Hana further argue that, despite the contractual requirement that New Trend and Chen share both profits and expenses (New Trend and Hana 56.1

106

Opp'n Statements to Chen Mot. at Resp. no. 9; Chen. Aff. dated Jan. 17, 2011, Ex. A ¶ 1), plaintiffs refused to share New Trend's business expenses, which included payroll costs, freight charges, customs duties, costs of housing employee Jin Ying Cai, costs of renting a new showroom, and losses associated with defective inventory. (See New Trend and Hana 56.1 Opp'n Statements to Chen Mot. at Resp. no. 9; Byunglim Louie Decl. dated Apr. 22, 2013, ¶¶ 5, 6).[25] They further argue that the Chen parties failed to pay contractually-mandated penalty late fees of $45,405.00 for failing to ship goods on schedule, as required by the Supplementary Agreement. (See New Trend and Hana 56.1 Opp'n Statements to Chen Mot. at Resp. no. 9; Byunglim Louie Decl. dated Apr. 22, 2013, ¶ 8).

The Chen plaintiffs have not filed a reply, and thus have offered no explanation for the apparent discrepancy between their calculation of amounts paid and amounts owed and the calculations proffered by the Louies. In any event, in light of the factual disputes among the parties concerning purportedly

---

[25] We note that although the contract did provide for the sharing of expenses, it also stated that "in the case of the business decided by one part[y], this party should share the los[s] or profit itself and bear all relevant expenses." (Chen. Aff. dated Jan. 17, 2011, Ex. A ¶ 3). We take that provision to mean that certain expenses were not to be shared equally among the parties.

unpaid amounts, we conclude that summary judgment on this aspect of the Chen parties' contract-breach claim should be denied.

### b. New Trend's Failure to Register Trademarks

The Chen parties also argue that New Trend violated their agreement by failing to register the marks Paris Angel and Miss Juli. They argue that Kisum Louie orally represented that New Trend would seek to register those marks in the United States, and they note that the parties' Letter of Intent provided for shared ownership and use of registered trademarks. (Chen 56.1 Statement in Supp. of Summ. J., ¶¶ 10-11). The Chen parties acknowledge that New Trend did apply to register the trademarks, but they assert that it ultimately abandoned those applications, suggesting that New Trend failed to act in good faith in pursuing registration. (Id. at ¶ 12).

According to the New Trend parties, the Paris Angel trademark application was in fact rejected by the United States Patent and Trademark Office because the company was unable to show that its goods were made in Paris, France, as the brand name apparently suggests. (New Trend 56.1 Opp'n to Chen Mot. Resp. no. 12; Byunglim Louie Decl., ¶ 12 & Ex. B). The New Trend

parties do not address the reason for failing to register the Miss Juli mark.

Hana and New Trend both dispute the Chen parties' claim to the unregistered marks. (See Sheppeard Decl. dated May 24, 2013, ¶ 3; New Trend Mem. of Law in Opp'n to Chen Mot., 4-5). The New Trend parties argue that any oral representations are irrelevant to the parties' purportedly integrated agreement. (See Byunglim Louie Decl. dated Apr. 22, 2013, 7; New Trend Mem. of Law in Opp'n to Chen Mot., 7). They also argue that the Chen plaintiffs are unable to show any injury arising from their claims concerning the trademarks. (New Trend Mem. of Law in Opp'n to Chen Mot., 5).

The provision in the Chen-New Trend Letter of Intent dealing with trademark registration states, "[o]n success of trademark registration, its ownership and usufruct are kept by both parties: No party can use or own it unilaterally." We conclude that this provision is ambiguous because it is unclear whether the provision implicitly requires New Trend to pursue registration of one or several trademarks, as the Chen parties have argued, or, instead, simply establishes a condition precedent to the parties' shared rights in any future trademarks

that the company might acquire. <u>Chimart Assoc. v. Paul</u>, 66 N.Y.2d 570, 573, 498 N.Y.S.2d 344, 346 (1986) (a contract provision is ambiguous if it is, on its face, "reasonably susceptible of more than one interpretation."). It is for the trier of fact to resolve such ambiguity. <u>Nappy v. Nappy</u>, 40 A.D.3d 825, 826, 836 N.Y.S.2d 256, 257 (2d Dep't 2007).[26]

Summary judgment is also unwarranted on the Chen plaintiffs' trademark-registration claim because the Chen parties have failed to establish any injury arising from New Trend's failure to register the marks at issue. <u>See</u>, <u>e.g.</u>, <u>First Investors Corp. v. Liberty Mut. Ins. Co.</u>, 152 F.3d 162, 168 (2d Cir. 1998) (damages are essential element of breach-of-contract claim under New York law); <u>Cherny v. Emigrant Bank</u>, 604 F. Supp. 2d 605, 608 (S.D.N.Y. 2009). We note that "'the mere registration of a trade-mark does not in itself confer any greater rights than existed at common law without registration'"

---

[26] Even if the trier of fact were to accept the Chen parties' reading of the contract as establishing an obligation that New Trend pursue registration of the trademarks at issue in this case, the plain language of the contract clearly does not require that New Trend guarantee registration of a trademark. As a result, because New Trend has put forward uncontroverted evidence showing that it did indeed pursue registration of the Paris Angel mark, though apparently without success, we conclude that it is beyond triable dispute that the Chen parties cannot establish a breach of contract with respect to the registration of the Paris Angel mark.

and "'confers only procedural benefits'" in the form of a rebuttable presumption that the registrant owns the mark and exclusive right to its use. <u>Dell Pub. Co. v. Stanley Publications, Inc.</u>, 9 N.Y.2d 126, 134, 211 N.Y.S.2d 393, 399 (1961) (quoting <u>Brown & Bigelow v. B B Pen Co.</u>, 191 F. 2d 939, 942 (8th Cir. 1951)). As a result, because the Chen plaintiffs have failed to allege, much less establish, that the failure to register the Miss Juli and Paris Angel marks caused them a disadvantage in the course of a legal challenge to their use of those marks, they cannot establish a contract-breach claim on their trademark-registration theory. As such, we recommend that summary judgment on that claim be denied.

### c. Kisum Louie's Failure to Invest $1 Million in New Trend

The Chen parties also argue that there was an oral agreement between the parties that Kisum Louie would invest $1 million in New Trend, but that he never did so. (See Chen Mem. of Law in Supp. of Summ. J., 4). The New Trend parties dispute that Kisum Louie ever made such a representation (see New Trend 56.1 Opp'n to Chen Mot., p. 8 ¶5), and they argue that Mr. Chen's testimony to that effect should be barred by the parol-evidence rule. (New Trend Mem. of Law in Opp'n to Chen Mot. 7).

They further argue that Mr. Chen's testimony involves
credibility issues that render summary judgment on the issue
inappropriate. (Id.). In addition, they assert that the Chen
parties have not cited to evidence in support of this claim.
(Id.). Lastly, the New Trend parties note that there was a
merger clause in the Stock Transfer Agreement between New Trend
and Mr. Chen, which they argue bars the consideration of any
purported oral agreement. (Id.).

We are cognizant of the fact that Mr. Chen has previously
put forward affidavit testimony asserting that Mr. Louie had
promised to invest $1 million in New Trend. (See, e.g., Chen
Aff. dated Jan. 17, 2011 ¶ 11). However, in the context of the
Chen parties' motion for summary judgment, they have failed to
cite to any such evidence, and their failure to do so is a
sufficient basis for denying summary judgment on that claim.
Local Rule 56.1(d); Holtz, 258 F.3d at 73. In any event, the
Letter of Intent and Supplementary Agreement contain no mention
of such a financial obligation on the part of Mr. Louie and, as
such, there is a triable dispute as to (a) whether Mr. Louie
made a $1 million promise and (b) whether the Chen plaintiffs
paid consideration for that promise. We note that there is
evidence to suggest that the Louies already held an ownership

112

interest in New Trend at the time that New Trend entered into an agreement with the Chen parties, which raises some question as to why Mr. Louie would have agreed to forgo his ownership rights until he had made an additional capital contribution to the company.

As for the New Trend parties' assertion that the Stock Transfer Agreement was integrated, we conclude, from the language of that document viewed as a whole, that it is at best ambiguous as to whether the merger clause applies exclusively to the terms of the stock transfer transaction or, as the New Trend parties suggest, more broadly to all of the prior negotiations between New Trend and the Chen parties. (See Byunglim Louie Decl. dated Apr. 22, 2013, Ex. A ¶ 8). We are skeptical about the New Trend parties' assertion that the parties' entire agreement became integrated upon the signing of the Stock Transfer Agreement, given that that agreement makes no mention of the preceding Letter of Intent or of any negotiations between the parties. (See generally id. at Ex. A). However, it is for the trier of fact to determine whether the agreement was fully integrated and, by extension, whether the parol-evidence rule applies to exclude Mr. Chen's testimony concerning oral agreements between the parties. Petereit v. S.B. Thomas, Inc.,

113

63 F.3d 1169, 1177-8 (2d Cir. 1995) ("Whether the parties
intended a writing to be an integration of their oral agreement
presents a question of fact.").

5. **The Chen Parties' Unjust-Enrichment Claims Against the New Trend and Chang Parties**

The Chen parties seek summary judgment on their claims for
unjust enrichment against the New Trend and Chang parties. New
Trend argues that summary judgment is inappropriate both because
it has a competing unjust-enrichment claim against the Chen
parties, and because those claims are inextricably linked to
issues of fact related to the Chen parties' contract claims.
(New Trend Mem. of Law in Opp'n to Chen Mot., 4). The Chang
parties dispute the unjust-enrichment claim on the grounds that
the Chen parties have failed to establish any contractual
relationship with them and, further, that the Chang parties were
good-faith purchasers for value. (Chang Mem. of Law in Opp'n to
Summ. J., 23).

It is axiomatic that a claim for unjust enrichment -- a
quasi-contract claim -- applies only in the absence of a valid
contract. Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue
Shield of N.J., Inc., 448 F.3d 573, 587 (2d Cir. 2006) (quoting

Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 388-89, 521 N.Y.S.2d 653, 656 (1987)). Since, as we have discussed (see supra 104-13), triable issues of fact remain concerning the scope and nature of the Chen-New Trend agreement, we conclude that summary judgment is not warranted on the Chen parties' unjust-enrichment claim against the New Trend parties.

We also conclude that a triable dispute remains over the Chen parties' unjust-enrichment claim against the Chang defendants. The Chen plaintiffs assert that the Chang defendants were unjustly enriched at the Chen parties' expense when New Trend transferred its inventory to NYCG. (See Chen Mem. of Law in Supp. of Summ. J., 6). The Chang defendants dispute this claim on the grounds that they were good-faith purchasers for value and had no relations with the Chen parties. (Chang Mem. of Law in Opp'n to Summ. J., 23).

In New York, a quasi-contractual claim, including one for unjust enrichment, is "'imposed by law where there has been no agreement or expression of assent, by word or act, on the part of either party involved.'" Beth Isr. Med. Ctr., 448 F.3d at 587 (quoting Clark-Fitzpatrick, Inc., 70 N.Y.2d at 388-89, 521 N.Y.S.2d at 656). An unjust-enrichment claim "lies only where

115

the defendant possesses money or received a benefit which in equity and good conscience the defendant should not retain because it belongs to the plaintiff." Martes v. USLIFE Corp., 927 F. Supp. 146, 149 (S.D.N.Y. 1996). There is no requirement that the parties have been in privity to establish a claim for unjust enrichment, but the New York Court of Appeals has stated that there must be some connection between the parties that is not "too attenuated." Sperry v. Crompton Corp., 8 N.Y.3d 204, 216, 831 N.Y.S.2d 760, 766 (2007).

The Court of Appeals has observed that the nexus between parties is too attenuated if the parties "simply had no dealings with each other," Georgia Malone & Co., Inc. v. Rieder, 19 N.Y.3d 511, 517-18, 950 N.Y.S.2d 333, 337 (2012), or if there is no "relationship between the parties that could have caused reliance or inducement." Mandarin Trading Ltd. v. Wildenstein, 16 N.Y.3d 173, 182, 919 N.Y.S.2d 465, 472 (2011). Of particular note for present purposes, the court in Georgia Malone distinguished the unjust-enrichment claim before it from that in a prior case, Bradkin v. Leverton, 26 N.Y.2d 192, 309 N.Y.S.2d 192 (1970), noting that although there had been no direct dealings between the Bradkin parties, the defendant in that case had been "an officer of the corporation with which the plaintiff

116

contracted and thus his relationship with plaintiff was much closer" than in Georgia Malone. 19 N.Y.3d at 519, 950 N.Y.S.2d at 338. Moreover, the Court of Appeals has suggested, in the context of an unjust-enrichment claim, that a defendant's awareness of the plaintiff and of the potential negative impact of its own conduct on the plaintiff may serve as further indication of the required closeness between parties. See id. at 517, 950 N.Y.S.2d 333, 337.

In view of Georgia Malone, we conclude that, despite the lack of any direct dealings between the Chen plaintiffs and the Chang defendants, there was sufficient connection between them to potentially support an unjust-enrichment claim. There seems to be no dispute that the Chen plaintiff's had formed a contractual relationship with New Trend that, at least initially, amounted to a form of joint venture. Moreover, while Nina Chang's status as an officer of New Trend is in dispute, there is no dispute that she was an employee of the company, was involved in helping to manage its finances (Chang Decl. dated May 23, 2013, ¶ 8), and knew that New Trend was in poor financial condition (id. at ¶¶ 9-10, 11) and that the Chen parties had done business with, and subsequently sued, New Trend. (See, e.g., Chang Dep. 104-05 ("Q: By this point in 2011,

117

though you knew that the Chen party lawsuit was ongoing and that the assets had been frozen on New Trend, correct? A. Yes. Q. And knowing all that, you still gave Mrs. Louie the money? A. Yes."); Sheppeard Decl. dated Apr. 16, 2013, Ex. 21 p. 3 (transcript of conversation discussing Chen's company, Meibang)). A trier of fact could, therefore, conclude that the Chang defendants were aware of the potential negative impact that their business dealings with New Trend might impose on the Chen plaintiffs. See Georgia Malone & Co., Inc., 19 N.Y.3d at 519, 950 N.Y.S.2d at 338. Given these considerations, we believe that the connection between the Chen and Chang parties is not so attenuated as to preclude the Chen parties' unjust-enrichment claim against the Chang parties.

Nonetheless, the Chen plaintiffs have failed to establish as a matter of law that they held any interest in the New Trend inventory that was conveyed to NYCG. Accordingly, we recommend that summary judgment on their unjust-enrichment claim against the Chang defendants be denied.

118

## 6. The Chen Parties' Fraudulent-Conveyance Claim

Like Hana, the Chen parties also seek summary judgment on their claim of a fraudulent transfer. The Chang parties oppose that motion, arguing, as they did in the context of the Hana motion, that adequate consideration was paid and that there was no intent to defraud. (Chang Mem. of Law in Opp'n to Summ. J., 24).

As the Chen parties acknowledge, it is an essential element of a claim for fraudulent conveyance that the plaintiff be a creditor whose claim has been impeded by the transfer in question. (See Chen Mem. of Law in Supp. of Summ. J., 6); see also Network Enter., Inc. v. APBA Offshore Prods., Inc., 2002 WL 31050846, *6 (S.D.N.Y. Sept. 12, 2002) (quoting Loblaw, Inc. v. Wylie, 50 A.D.2d 4, 375 N.Y.S.2d 706, 709 (4th Dep't 1975)); PalmOne, Inc. v. R.C.S. Computer Experience, L.L.C., 15 Misc. 3d 1127(A), 841 N.Y.S.2d 220 (Sup. Ct. N.Y. Cnt'y 2007). Because, as we have discussed, it remains an issue of disputed fact whether the Chen plaintiffs were owed monies by New Trend and, thus, whether they qualified as creditors of the company, summary judgment on their fraudulent-conveyance claim should be denied.

## 7. The Chen Parties' Conversion Claim

As for the Chen parties' conversion claim, summary judgment
is unwarranted for reasons substantially similar to those
discussed concerning their fraudulent-transfer claim. It is an
essential element of a claim for conversion that the plaintiff
be able to show that it holds an immediate and superior right of
possession to the goods at issue, as compared to the defendant.
Here the Chen parties have not established beyond triable
dispute that they qualified as creditors of New Trend and had
any right to its inventory. For that reason, summary judgment on
the Chen parties' conversion claim should be denied.

## CONCLUSION

For the reasons discussed, we recommend that the court: (1)
grant summary judgment to Hana on its breach-of-contract claims
against the New Trend defendants (see supra 37-42); (2) deny
summary judgment on Hana's fraudulent-conveyance claims (see
supra 42-79); (3) deny summary judgment to Hana on its
conversion claim against the Chang defendants (see supra 79-90);
(4) deny summary judgment on Hana's replevin claim against the
Chang defendants (see supra 91-93); (5) deny summary judgment on

120

Hana's first claim for declaratory relief and partial judgment; and (6) deny summary judgment on each of the Chen plaintiffs' claims. (See supra 96-120).


In addition, we recommend that, pursuant to Rule 56(g), the court deem the following facts to be established beyond triable dispute: (a) that Hana holds a first-priority perfected security interest over New Trend's inventory that is superior to the interest of any other party (see supra 94); (b) that Hana is entitled to possess such an amount from the escrow account created from the sale of New Trend inventory as will satisfy the obligation of the New Trend defendants under the guarantee of Hana's loan to JMC; (c) that the Chang defendants failed to pay fair value for the inventory conveyed to NYCG by New Trend (see supra 95); (d) that the Chang defendants do not qualify as innocent purchasers for value under DCL § 278 (see supra 77-79); and (e) that even if it is found that the Chen and New Trend parties agreed that New Trend would pursue registration of the Paris Angel and Miss Juli marks, New Trend may not be held to have breached that agreement vis-à-vis the Paris Angel mark. (See supra 101 n. 26).

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable George B. Daniels, Room 1310, 500 Pearl Street, New York, New York, 10007-1312, and to the undersigned, Room 1670, 500 Pearl Street, New York, New York, 10007-1312. Failure to file timely objections may constitute a waiver of those objections, both in the District Court and on later appeal to the United States Court of Appeals. See 28 U.S.C. § 636 (b)(1); Fed. R. Civ. Pro. 72, 6(a), 6(e); Thomas v. Arn, 474 U.S. 140 (1985); DeLeon v. Strack, 234 F.3d 84, 86 (2d. Cir. 2000) (citing Small v. Sec'y. of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989)).

**Dated: New York, New York**
        **March 7, 2014**

**MICHAEL H. DOLINGER**
**UNITED STATES MAGISTRATE JUDGE**

**Copies of the foregoing Report & Recommendation have been sent today to:**

Heng Wang, Esq.
Wang, Gao & Associates, P.C.
7 Mott Street, Suite #600
New York, NY 10013

Samuel Weissman, Esq.
44 Monroe Street-A1
New York, NY 10002

Michael James Sheppeard, Esq.
Ball, Stoll, Bader and Nadler
729 Seventh Avenue, 17th Floor
New York, NY 10019

Randy M. Kornfeld, Esq.
Kornfeld & Associates P.C.
570 Lexington Avenue, 17th Floor
New York, NY 10022